# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 21, 2012 Session

## STATE OF TENNESSEE v. DALE KEITH LARKIN

### Appeal from the Criminal Court of Washington County
### No. 35150     Robert E. Cupp, Judge

### No. E2011-01288-CCA-R3-CD - Filed March 28, 2013

Dale Keith Larkin ("the Defendant") was convicted by a jury of first degree premeditated murder and one count of insurance fraud. The trial court sentenced the Defendant to life imprisonment for the murder conviction and to a concurrent term of eight years for the fraud conviction. In this direct appeal, the Defendant raises the following issues: (1) the trial court erred in refusing to sequester the jury; (2) the trial court erred in allowing the Defendant's expert witness to testify for the State; (3) the trial court erred in admitting autopsy photographs and some of the victim's bones into evidence (4) the trial court improperly limited the Defendant's right to cross-examine a State's witness; (5) the prosecutor engaged in misconduct during closing argument; (6) the evidence is not sufficient to support his convictions; (7) the trial court failed to discharge its duty as thirteenth juror; and (8) the cumulative effect of these errors violated the Defendant's rights to a fair trial. Upon our thorough review of the record, we have determined that (1) the trial court failed to satisfy its mandatory duty to act as thirteenth juror; (2) the trial court committed reversible error in allowing the Defendant's expert witness to testify for the State; (3) the State failed to adduce sufficient proof to support the Defendant's conviction of first degree premeditated murder; and (4) the State failed to adduce sufficient proof to support the Defendant's conviction of insurance fraud. Therefore, we must reverse the Defendant's convictions and remand this matter for a new trial on the charge of second degree murder and any appropriate lesser-included offenses. The charge of insurance fraud is dismissed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments
### of the Criminal Court Reversed; Remanded

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P. J., and ALAN E. GLENN, J., joined.

Mark D. Slagle (on appeal and at trial); Penny J. White (on appeal); and Johnathan A. Minga (at trial), Johnson City, Tennessee, for the appellant, Dale Keith Larkin.

Robert E. Cooper, Jr., Attorney General & Reporter; Renee W. Turner, Senior Counsel; Tony Clark, District Attorney General; and Dennis D. Brooks, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

The victim in this case, Teresa Larkin, died on November 18, 2003. She was survived by her eleven-year-old daughter, Tia Gentry, and her husband, Dale Keith Larkin, the Defendant. The victim's life was insured under several life insurance policies. Tia Gentry's biological father, Tony Garland Gentry,[1] filed a civil lawsuit on Tia's behalf against the Defendant alleging that the Defendant had caused the victim's death, either by negligence or by homicide. Gentry also sued the insurers of the victim's life. The impacted life insurance proceeds were paid into court and, at the time the lawsuit was settled, exceeded 1.2 million dollars. The lawsuit eventually was settled through mediation.[2] According to the Order of Compromise and Dismissal, Order to Enforce Mediated Agreement and Order Approving Minor's Settlement, filed in August 2006, Tia received $500,000 and the Defendant received the remaining sum, less court and mediation costs and the guardian ad litem fee.[3]

In July 2009, almost three years after the conclusion of the civil action and almost six years after the victim's death, the Defendant was indicted on one count of first degree premeditated murder for the death of the victim. The Defendant simultaneously was indicted on three counts of insurance fraud, one count of which was dismissed later by the State. The Defendant was tried before a jury in late January and early February 2011. The following proof was adduced at trial:

Tia testified that she was eighteen years old and a student at East Tennessee State University ("ETSU"). On Tuesday, November 18, 2003, when she was eleven years old, Tia came home from school and walked into the garage where the Defendant was standing by his workbench. Tia asked the Defendant where the victim was, and the Defendant told her

___

[1] For ease of identification, we will refer to Tia Gentry as Tia and Tony Garland Gentry as Gentry. We intend no disrespect by referring to Ms. Gentry by her first name.

[2] The parties entered into a written mediation agreement on June 21, 2006. Gentry subsequently tried to withdraw from the agreement. The Defendant filed a motion to enforce the agreement, which the trial court granted by a written order filed on August 23, 2006.

[3] The referenced Order was admitted as an exhibit at the Defendant's criminal trial.

that she was upstairs. Tia went upstairs and found the victim's jacket and shoes in Tia's room near Tia's computer. She continued to look for the victim and eventually found her in the victim's bathroom. The victim was sitting in the bathtub, with her legs outstretched and her back against the back of the tub. The victim's head was tilted to the side. Tia spoke to her, but the victim did not respond. Tia went to her and shook her, but the victim remained unresponsive.

Tia stated that there was water in the bathtub, reaching to about the victim's chest. The water temperature was "like room temperature, maybe warm." Tia described this as unusual because her mother liked "really hot baths." When the victim failed to respond, Tia panicked and yelled at the Defendant that the victim "won't wake up." The Defendant walked upstairs and pulled the victim out of the bathtub by her arms. He told Tia to get Dr. Wiles, a neighboring physician. Tia called 9-1-1 and went to get Dr. Wiles. The victim subsequently was taken to the hospital.

Tia testified that, after her mother's death and before she moved in with Gentry, she asked the Defendant "if he thought maybe somebody had poisoned [her mother] or something." According to Tia, the Defendant "kind of like got very defensive about it and kept asking [her] who put that in [her] head."

On cross-examination, Tia acknowledged having given a video statement to law enforcement not long after the victim's death.[4] In her statement, she described her mother as "stressed out" on the morning of her death. She also told the police that she heard her mother call her name as she was looking for her. When describing the Defendant's actions, she told the police that, when he pulled the victim out of the bathtub, "he just like jerked her out and it hit her head into the tub."

Tia testified that the victim had worked as a pharmaceutical representative for Merck, and one of the drugs her mother sold was Fosamax. Her job required her to be on her feet a lot. On redirect, the prosecutor asked if Tia had overheard conversations between her mother and the Defendant about "money issues." Tia responded, "I know that he had quit getting money [from his employer] and that created some money problems for them and they would argue about me and [the Defendant's daughter] and money."

Dr. David Allen Wiles, a neurosurgeon, testified that he lived near the residence of the victim and the Defendant. On the day in question, he and his wife had just returned home from shopping. They passed the Defendant sitting on the curb, who told them he was waiting

---

[4] She also gave a later video statement at which Gentry was present. The record on appeal does not contain these statements but does include excerpts played for the jury and transcribed.

for Tia to come home. Shortly thereafter, Tia "came running across the street screaming." Dr. Wiles and his wife accompanied Tia to the victim's home, and he went inside while his wife stayed outside with Tia. As he entered the house, he yelled for the Defendant, and the Defendant directed him to the bathroom. He testified to what he saw in the bathroom:

> [The victim] was in the bathtub, she was bluish, did not appear to be breathing and I did a quick kind of scan of what was going on and checked her pulse and couldn't tell whether she had a pulse or not, I thought hopefully that she did, and told [the Defendant] we needed to start CPR. We couldn't do that in the bathtub.

Dr. Wiles clarified that he checked the carotid pulse and "thought maybe there was a very weak pulse." He, however, was not sure whether she had a pulse. He described the victim's position in the bathtub as "a typical position for being in a bathtub," that her head was above water, and that the water level was about at her chin. The victim's head was back against the back of the tub.

Dr. Wiles asked the Defendant to assist him in getting the victim out of the tub. He testified:

> [W]e pulled her out over the edge head first, face-up so she was kind of dragging over the edge on her back. As I recall, [the Defendant] was at the head, and as she came out over, I kind of grabbed her under her arms around her chest and we lifted her over. I remember her being – she was not a big woman but I remember her being heavy and it wasn't an easy job to get her out of the tub. We got her out and put her on the floor next to the tub and there was not a lot of room there. We then moved her down the hallway to an area where there was more room and started CPR at that point.

Dr. Wiles did not remember the victim striking her feet or her knees as they dragged her out of the tub.

The two men began performing CPR on the victim with Dr. Wiles doing the chest compressions and the Defendant doing the breathing. They performed CPR until emergency medical personnel arrived in less than ten minutes.

Dr. Wiles testified that he noticed "a little bit of vomitous" in the corner of the victim's mouth. There was also some water in the victim's mouth, but he did not recall it being "a large volume." Dr. Wiles explained that, in the past, he had broken the sternum of an individual on whom he was performing chest compressions during CPR. He did not recall hearing the sound of the victim's sternum breaking.

-4-

Asked what he remembered about the bathroom, Dr. Wiles testified that he recalled seeing a glass of wine and a bottle of pills. He asked the Defendant if the victim had any medical problems and whether she could have overdosed. The Defendant told him that the victim had had some wine, that they had taken the bath together, and that she was fine when he got out of the bath and left. Dr. Wiles testified that the medication was an antidepressant and that there was still some in the bottle, which was not open.

As to getting the victim out of the bathtub, Dr. Wiles added:

[I]t was, of course, a very urgent and rushed thing trying to get her out and get CPR going so it was – I'm certain it was aggressive, you know, we tried to be gentle but tried to be quick, and I do recall very clearly that I remember thinking, you know, this little lady weighs a lot. I hate to say the term but you know you hear the term "dead weight," that's really what it was like. It was hard to get her out over that tub. It wasn't easy and she was wet and slippery and trying to get a good hold on her, it was hard.

On cross-examination, Dr. Wiles described the Defendant's demeanor as they struggled to get the victim out of the tub as "very distraught and anxious over what was going on." He recalled the Defendant speaking to the victim, saying, "Come on, Teri," "Please come back," and "Don't die." Dr. Wiles also stated that, while he and the Defendant were performing CPR on the victim, the Defendant "developed chest pain and had to take a nitroglycerin pill."

Dr. Gretel C. Stephens, a forensic pathologist, testified that she performed an autopsy on the victim on November 19, 2003. She explained that, when she received the victim's body, she was not given a great deal of information about the circumstances surrounding the victim's death. She testified, "All we had was the order for autopsy, which was very brief, succinct and not very informative, which said 'Subject was lying in bathtub, she had a past history of depression, no known medication.'" Accordingly, she began the autopsy with the idea that the victim may have drowned.

During the autopsy, beginning with the exterior of the victim's body, she noted "multiple cutaneous and deep contusions," including a contusion on the dorsal left upper thigh; contusions of the dorsal left arm; contusions of the right elbow; a fracture of the left upper arm; a contusion of the right lateral abdomen; a contusion of the lateral left knee; a contusion on the back of the left calf; a contusion to the right big toe; and contusions to the upper portion of the left big and second toes. Dr. Stephens explained that these injuries were "fresh," i.e., "near the time of death or could be a day or two in." She also noted bruises to the right leg that were "a bit older."

Dr. Stephens explained her reaction to the victim's bruises:

> The finding of the bruises was – without a history of major falling, seizure disorder or something like that where multiple areas had been bruised and it all looked fresh, at least the ones that I pointed out, suggested to me that there was something more going on than a routine, "Oops, I drowned." I've seen drowning in the bathtubs multiple times and very few of them have I been particularly concerned about. I got further concerned when we were able to show the fracture of the left upper arm bone. That's very unusual from just simply a fall. As a result of that, I did some additional testing. I thought, "Well, maybe, since we didn't have a history otherwise, she'd been involved in some sort of a struggle and this was actually a rape, homicide or something like." Forensic pathologists always tend to think the worst so that we can rule them out. So we actually did studies in case we needed them for rape testing. We also did additional sections that I wouldn't ordinarily do in an autopsy including take out the area of the end of the bones at the fracture and look at them under the microscope. Even though I didn't find any tumor of any sort in Teresa Larkin, sometimes pathologic fractures can occur in an area where the bone is weak and it just means it's a fracture that occurred because something else was interfering with the normal strength of the bone in that area. . . . I also did a section of the vertebra of the vertebral column because another thing that can occur usually in older women or in somebody that's been on a lot of prednisone or other type of a steroid that tends to weaken your bones, can lead to very weak bones. If she had very weak bones, then a fracture like that might have occurred without the usual degree of force or trauma that would have been required to break that bone in a woman who was just thirty-seven. So I did additional studies because of that.

Her additional testing did not indicate either osteopenia, "kind of the early precursor to osteoporosis," or osteoporosis, conditions of bone weakening. She opined, "there was no major osteopenic components identified" at the fracture site.

In addition to the external bruising, Dr. Stephens also noted that the victim had suffered internal bruising "at the upper part of the buttock and kind of over a bony prominence"; "involving the upper portion of the back and shoulder area"; and of the left breast. There also was bruising to the victim's scalp, to the left side of her thyroid gland, and to the right side of her tongue. Dr. Stephens did not see any indication that the victim's sternum was fractured.

Dr. Stephens testified that the victim's lungs each weighed more than normal, indicating that her lungs contained excess fluid "or something." She also found colonies of bacteria in the victim's lungs. She explained:

> Well, the usual thing that you see in drowning is there are several things that you can see, but the one that really points to drowning, is when you have just horrendous froth coming out the mouth and nose and that's from pulmonary edema fluid mixed with the water of the drowning and it all just kind of bubbles back up at you when you're trying to resuscitate the person. Usually by the time we see them in the morgue, they still show that unless they've been subjected to a long resuscitative effort so that they've been pumped and pumped and pumped and all of that excess fluid is now kind of forced out of the lungs. So, you know, we're not seeing that, but what we are seeing is bacterial colonies. If you're pumping somebody's chest and breathing for them and they've got bacteria up in the throat area, you can shove that down and it can go into the lungs. It's unusual to see it that far out and the same thing can happen if you choke on vomit or choke on materials from the upper throat or if you drown. You can have, from the breathing in of the water through the airway, it can wash some of those bacteria from either the bath water itself or from the upper airway down into the lungs.

She added that the fact that the victim was found with her head above water "and the lack of any clear indication that she had this horrendous froth and certainly no froth when I looked at her, went against drowning."

Dr. Stephens ruled that the probable cause of the victim's death was asphyxiation, with blunt trauma also present. She explained that asphyxiation "just means that the oxygen is not getting to the brain" and that the condition "can happen in multiple ways," including drowning, smothering, and heart stoppage. She added, "If you are being compressed hard enough in your chest area so that you can't inhale, that can cause an asphyxial death." She also explained that petechia hemorrhages, such as were noted on the underside of the victim's eyelids, are "tiny pinpoint hemorrhages." The possible causes for these hemorrhages include choking, strangling, smothering, violent vomiting, and heart attack. She stated that petechia hemorrhages can also occur "if you don't clot normally" or if "it's someone who tends to bruise easily."

As a result of the autopsy, Dr. Stephens concluded that the manner of death could not be determined. She was suspicious of homicide, however, so she telephoned the Johnson City Police and asked them to investigate. She stated that, had she had access to the medical reports that were developed later in the case, she would have concluded that the manner of death was homicide.

In conjunction with her testimony, the autopsy report Dr. Stephens prepared was admitted into evidence. That report contains the following summary of the "anatomical diagnosis": "(1) Multiple contusions[;] (2) Proximal fracture of the left humerus with extensive contusion[;] (3) Large surgical scar of left upper arm and shoulder[;] (4) Numerous bacterial colonies in the peripheral and central lungs[;] (5) Petechial hemorrhages of the conjunctivae[.]" The report provides cause of death as "Asphyxiation, with blunt trauma also present." The "narrative of findings" provides as follows:

> This 37 year old woman died due to asphyxiation with a broken left arm and multiple bruises also present. The type of asphyxiation is not clear, since the occurrence was in a bath tub and drowning may have occurred, but resuscitative efforts were also undertaken, with extensive bacteria in the peripheral lung tissues being the only feature suggestive of drowning. There is evidence for asphyxiation since there were petechiae of the eyelids. Drug tests showed only a small concentration of ethanol present in the fluids and no other drugs. The findings are especially troubling due to the major injury to the left upper arm in addition to other areas of bruising. The manner of death could not be determined. No marked osteopenia of her bone is shown.

The date of the report is March 10, 2004, almost four months after the victim's death.

On cross-examination, Dr. Stephens acknowledged that she could not determine "what the mechanics of death were in this particular instance," even taking into account the later medical reports which she reviewed. She also acknowledged that she had not reviewed the victim's medical records in conjunction with performing the autopsy. She admitted that it would have been "helpful" to have known that the victim had fractured her left humerus in January 2001 from slipping on the ice. She also acknowledged that, if the victim had had osteoporosis, it was "very likely" that she would have suffered "parallel bone fractures . . . in both arms if she . . . was pulled from the tub by both arms." However, she denied seeing osteoporosis during her examination, stating that she "even checked vertebrae." She denied knowing that the victim had had "compression fractures of two vertebral bodies," explaining that she "could see only what [she] could look at with the naked eye which looked like a mild degree of osteo-arthritic change." Dr. Stephens stated that her lab did not have an x-ray machine and that her "method of testing for a fracture was to see if something moved where it wasn't supposed to." Using this method, she did not find any fractures to the victim's sternum or ribs or to the victim's right arm. She found the fracture in the victim's left arm only because the arm was bent in an abnormal fashion.

Dr. Stephens acknowledged that a bruised tongue can be evidence of a seizure. The victim also could have bruised her tongue while fainting.

On redirect examination, Dr. Stephens reiterated that she "did not find major weakness of [the victim's] bones" and "no objective evidence for osteoporosis." She also stated that the victim's past gynecological problems did not necessarily mean that the victim suffered from osteoporosis. The toxicology report prepared in conjunction with the autopsy revealed "a very small amount of alcohol in the blood" but no drugs in the victim's system.

On further cross-examination about the manner of death, Dr. Stephens testified, "I didn't suggest mechanical asphyxiation although that was a consideration. I did consider and cannot rule out drowning still because of the extensive resuscitative effort that changed a lot of the findings that we might see."

Dr. Darinka Mileusnic-Polchan, the Chief Medical Examiner for Knox and Anderson Counties, Tennessee, testified that, several years prior to the criminal trial, the Defendant's lawyer asked her to review Dr. Stephens' autopsy report and related materials, including photographs and microscopic slides prepared from the victim's organs, in conjunction with the Defendant's efforts to collect the life insurance proceeds payable on the victim's death. Dr. Mileusnic[5] also reviewed the statement the Defendant gave to the police. After reviewing and analyzing these materials, Dr. Mileusnic prepared a written report dated May 31, 2006, which was admitted at trial and includes the following:

> Gretel C. Stephens, M.D. at East Tennessee State University, Forensic Pathology Division, performed full autopsy on November 19, 2003. Two different findings/conclusions were listed as the main diagnosis under Primary Series subtitle: 1. Asphyxiation; 2. Blunt trauma. Based on the objective documentation (photographs and microscopic slides) and choice of words, it seems that Dr. Stephens excluded drowning and implied mechanical asphyxia. Unfortunately, it is not clear from the autopsy report what kind of mechanical asphyxia Dr. Stephens had in mind when she was formulating her final opinion.

> There are few gross findings (Primary Series) supporting mechanical asphyxia – petechiae of the conjunctivae and contusion of the deep left neck tissue next to the thyroid gland. Regrettably, there are no photographs of petechiae to document the finding. Without objective documentation and detailed description of the density and other characteristics of conjunctival petechiae, this statement becomes meaningless. Soft tissue contusion in the left neck is minor and does not involve skeletal muscle. With no other

_____
[5] Dr. Mileusnic-Polchan confirmed that she goes by "Dr. Mileusnic."

accompanying findings, it is impossible to base the main diagnosis of mechanical asphyxia just on this detail.

Second part of the main diagnosis, blunt trauma, is depicted in several gross photographs as well as in several microscopic slides. If one disregards neck finding, right lateral tongue hemorrhage and petrous temporal bone finding, eighteen foci of contusions are observed. Comparison of the listed diagnoses and photographs allows for better understanding what kind of trauma we are dealing with. First of all, majority of bruises are over bony prominences such as shoulders, right elbow, right iliac crest and left knee. Many of the listed contusions would be consistent with [the victim] being pulled out of the bathtub and placed on the hard surface where resuscitation began. Additional contusions included dorsal left arm, left breast, parieto-occipital scalp, right lateral abdomen, thighs, left calf and bilateral toes. Posterior incision into the skin and muscle of the back nicely demonstrates hemorrhage at the level of the shoulder blades where the body came in contact with the hard surface/floor. The same is true for the occipital subscalp hemorrhage.

Fracture of the left humerus with surrounding hemorrhage is the only major fresh-appearing trauma. Similar to the rest of the contusions elsewhere on the body, there is no surrounding inflammatory reaction, consistent with perimortem occurrence. It is not hard to envision occurrence of these traumatic findings during aggressive pulling of the body from the bathtub and subsequent resuscitation.

Dr. Stephens lists a couple of more findings such as peripheral tongue hemorrhage and petrous temporal bone congestion. Peripheral tongue hemorrhage is more consistent with terminal seizure rather than trauma due to foul play. Finally, petrous temporal bone congestion is neither contusion nor trauma. As the matter of fact, it is a very nonspecific finding, which is frequently noted in drowning deaths. Diagnoses listed under the Secondary Series subtitle constitute minor incidental findings, which will not be discussed here.

Autopsy reveals heavy and edematous lungs (1350 grams combined weight). Microscopically, there is severe generalized edema noted throughout the alveolar spaces bilaterally as well as focal hemorrhage and bacterial clumps. Bacterial colonization of the lungs when autopsy is done shortly after death indicates aspiration and transfer of oral flora distally in the lungs. These findings coupled with watery gastric content and [the Defendant's] account of

-10-

water coming out of his wife's mouth would indicate drowning. Although [the victim] was found in only approximately one foot of water, her husband did indicate that the tub was leaky.

Additional microscopic findings include mild hepatic steatosis (fatty liver) and colloid cyst of the thyroid cartilage with focal surrounding intramuscular extravasation. As the matter of fact peripheral focal extravasation (leaking of blood in surrounding tissue) is also noted in the pelvic region and in the perirenal soft tissue (around kidneys). The extent and location of these foci of extravasation indicate perimortem agonal changes that were occurring irrespective of trauma. Therefore, overinterpreting these changes anywhere in the body could be misleading. Neuropathologic exam demonstrates early red neuronal changes, particularly in the cerebellar Purkinje cells, consistent with terminal hypoxia. Foci of extravasation or microscopic bleeding are noted in several brain sections.

The most interesting finding in this autopsy is cardiac histopathology. Heart sections taken by Dr. Stephens indicate worrisome changes that could not be ascribed only to agonal artifact, resuscitation or laboratory artifact (recut glass slides 1 and 2). In her histological description Dr. Stephens did indicate presence of focal hemorrhage in the heart muscle. In that same section of the cardiac muscle, in the vicinity of the extravasation/bleeding there are subtle inflammatory changes present such as focal clustering of lymphocytes, macrophages and rare neutrophils. In the foci of myocytolysis (muscle fiber breakdown) there is abundant cellular debris and surrounding interstitial edema. These changes are frequently indicative of myocarditis, which is notorious for focality and random distribution with wide skip areas. In cases of suspected myocarditis additional random sampling of the heart muscle is highly recommended.

Dr. Mileusnic's report to the defense concluded as follows:

Based on the currently presented evidence, terminal cardiac event with agonal seizure and possible drowning cannot be excluded. In summary, most gross and microscopic findings in support of mechanical asphyxia with blunt trauma are insufficient to be listed as the main cause of death without [sic] reasonable medical certainty. More detailed cardiac examination with additional sectioning is recommended.

-11-

If you have any additional questions or new investigative information becomes available, please do not hesitate to contact me. Thank you for giving me an opportunity to work with you on this troubling case.

At trial, she explained her opinion as follows:

The final opinion, of course, all boils down that what I thought to be cause, potentially manner of death would be, the cause of death I had to base essential information received and autopsy findings. The most remarkable thing for me in the autopsy, and you heard a lot of it from Dr. Stephens, is that her lungs were extremely heavy, [the victim's] lungs were extremely heavy and there was a lot of clear fluid coming from her mouth and that was at that time as [the Defendant] observed and described in the report and by [defense counsel's] also account, so all that coupled together, plus watery fluid and watery content in the gastric content to me, that was very significant for drowning, there was no question about it. And actually, even to this point there's no question about it in my mind. Now, the other finding that I had to rely on is, okay, we do have this blunt trauma that Dr. Stephens was concerned about. Of course, I'm looking at the trauma from the photographs and as there always is, photographs sometimes can be underwhelming depending on how they're presented and some of the things that I wanted to see, such as some of the bruising under the scalp a little bit better angle or petechiae in the eyes, I could not see, they were not in the photographs. So because of that, I couldn't really put so much weight on that particular finding as far as bruising was concerned. But there was one big thing that we all discussed yesterday and that's – or the witness discussing it yesterday, and that was the fracture in the left arm and that was the arm that would be turned toward whoever is rescuing [the victim] from the bathtub. So in case you're going to lift, I don't know, 120-pound woman just by that arm in the bathtub, I can see how that could potentially happen. So I said "Okay, if that's the case, I can see that happening during that particular rescue." I think it's drowning and I still think it's a drowning. But as far as what could contribute or lead to this drowning, because she had some issues but she didn't have seizures, she didn't have a lot of alcohol in the blood, so what could lead to that, then I was looking a little bit deeper, I was looking into tissue histology to see if I can find anything. Now the heart was one area that I was concerned about and that's the section Dr. Stephens took from the front of the heart, the left ventricle front right kind of under the breastbone that showed, as she described, a little of a hemorrhage. I said, "Well, there's a little bit of hemorrhage," which is bleeding in the heart muscle, and I'm also seeing some debris there. Well, could it be that something is happening in the heart that maybe could lead to her sudden loss

-12-

of consciousness that would cause her to drown? So that's basically what I said in my report as a conclusion, is drowning, what could lead to that, it's possible.

She added that "drowning was more important than traumatic or other kind of mechanical asphyxia[,] that's compression of the neck or mouth or of the chest." She also testified that, at the time she prepared her initial report, she attributed the majority of the victim's bruising to the rescue attempts.

Dr. Mileusnic faxed her report to the Defendant's lawyer on June 6, 2006. She subsequently met with representatives of the State and law enforcement concerning the victim's death. They discussed exhuming the victim's body for further evaluation. In March 2009, the victim was exhumed from her above-ground vault and Dr. Mileusnic performed a second autopsy. In conjunction with performing this second autopsy, Dr. Mileusnic prepared an "Autopsy Final Report" which was admitted into evidence and which contains the following "Narrative":

> The body of Teresa Larkin, a 37-year-old white female, was exhumed on March 12, 2009 for a second autopsy and detailed anthropologic examination. In spite of the previous removal of the fractured left proximal humerus, multiple additional fractures and contusions not obscured by the decomposition process are recorded at this time. The results of the first autopsy had been reviewed previously addressing areas of concern. Second autopsy with anthropologic study and additional testing as well as more detailed investigative information reveal [the] following:
>
> 1. Follow up investigation indicates that the witnessed retrieval of the body from the bathtub and resuscitation efforts were not aggressive to the point of inflicting any significant injury to the body of [the victim]. Revival efforts were both initiated and conducted by trained medical personnel throughout the resuscitation;
>
> 2. Additional examination of the tissues, organs, particularly the heart sections, coupled with anthropologic evaluation reveals that: a. The previously noted cardiac changes are traumatic in nature. Parallel sternal fractures as well as predominance of extravasated erythrocytes rather than inflammatory cells in the sampled myocardium are consistent with blunt force injuries; b. Subcutaneous, intramuscular and subscalp contusions are very deep and still observable despite the prolonged burial and decomposition changes with maggot infestation. Distribution of fractured bones matches the originally described skin and soft tissue contusions.

-13-

Initial review of the victim's medical records tells me that [the victim] was a rather healthy lady with minor issues such as sinusitis and vaginal discharge. More than a year prior to her death she had a near-fainting episode.

In summary, the cause of death is homicidal drowning with traumatic asphyxia and multiple blunt force injuries as contributing factors in death of [the victim]. The extent, appearance and distribution of the skeletal injuries cannot be explained away by any accidental or suicidal events, natural conditions and/or reasonable artifacts of resuscitation, postmortem handling of the body, first autopsy or exhumation.

During the second autopsy, Dr. Mileusnic noted that the victim's right humerus was also fractured, with a "complex spiral fracture." She testified that the fractures to both upper arms were caused by "a spiral twisting motion." Dr. Mileusnic also found "grinding-type fractures" in both of the victim's elbows as well as "two very interesting fractures in the sternum." She testified that the fracture to the victim's left elbow "[c]ould have happened around the same time" as the fracture to the left humerus. As to the sternum fractures, she stated that it was "relatively rare" for such fractures to be caused by CPR. She explained further:

A sternum can fracture in trauma cases, a sternum can sometimes fracture during resuscitation but whenever there was fracture of the sternum or the breastbone in resuscitation, it was always preceded with the fracture of the bones – of ribs. I've never seen fractured sternum that did not have fractured ribs that were due to resuscitation, and whenever that happened, it was always the weakest part of the sternum, the breastbone, and it's really the thinnest. This was not the thinnest part of the sternum, this was actually lower down where the sternum sort of kind of curves and creates kind of a widening or an enlargement. So the location on the sternum, the fact that there were two fractures on the sternum, two lines, were very disturbing to me.

She also stated that, after she performed the second autopsy, she concluded that "the most consistent and meaningful explanation [for the injuries to the heart noted during the first autopsy] was actually there was contusion on the heart that was related to the trauma to the sternum."

In addition to the fractures, Dr. Mileusnic found two areas of "hemorrhage or bleeding under the skin and in the muscle," one area in the victim's back and the other area toward the victim's buttocks. She stated that these areas of deep bruising were "not visible superficially."

-14-

Dr. Mileusnic reiterated that she "still st[oo]d by" her original determination that the main cause of the victim's death was drowning. She continued: "Now how drowning occurred and how it came about, in my opinion it was actually a very violent death that led to her drowning and/or a violent mechanism that led to her drowning." She added, "if this were my jurisdiction, I would call it homicide."

On cross-examination, Dr. Mileusnic acknowledged that she faxed her initial determinations regarding the victim's death to the Defendant's lawyer on June 6, 2006, but she did not recall speaking to Detective Sherfey about the case on the same day. However, she did recall speaking with Detective Sherfey several times over the course of "a long time." She stated that she resisted becoming further involved in the case because it was "troubling" and "nasty." She added that the Defendant's civil litigation had been concluded before she had "any serious conversation with the State to get involved in the exhumation." At that point, she testified, she "got kind of dragged into this case again because [she] felt obligation toward the victim that [she did] need to review whatever additional information and evidence is there." She testified that she had "nothing to do with" the Defendant or defense counsel after defense counsel called her and told her that the civil litigation was "done and over and it's favorable."

Dr. Mileusnic explained that, when she performed her original work for the Defendant, she "had no objective scene investigation information whatsoever" and "didn't really have any medical history on [the victim]." When she began working for the State, she "was given scene photographs because it's really important to see where did this all occur." She also learned from conversing with Detective Sherfey that "this bathroom actually was nicely carpeted which would actually reduce all this trauma from dropping the body on nice plush carpet resulting in bruising the back of the head, bruising the back of the shoulders, well, that was not an equation anymore." Additionally, the State provided her with the victim's medical records, including psychiatric records. However, she did not recall specifically a letter from Dr. William C. Diebold indicating that the victim was being treated for anxiety and depression in May 2002, was scheduled for a follow-up visit in three months, and was "also seeing a therapist for more frequent visits."

Based on the medical records she reviewed, she learned that the victim was dealing with some minor musculoskeletal pain, probably related to an old injury received in a motor vehicle accident; "on and off" depression; and some "gynecological issues" including a hysteroscopy, a uterine ablation, and a tubal ligation. She also acknowledged that the victim's medical records reflected that the victim had had a near-fainting episode a year prior to her death; previous compression fractures of her back; a previous fracture of one of her toes; and "skeletal issues in terms of pain." She also acknowledged that the victim had suffered a prior fracture to the left humerus. She stated that this previous fracture "healed

with no residue." Dr. Mileusnic testified that merely looking at a bone was not sufficient to determine whether the individual suffered from osteoporosis.

When asked if the victim could have had a seizure prior to her drowning, Dr. Mileusnic responded, "I've never seen so much bruising and injury on the body just from seizure and drowning subsequent to the seizure in a bathtub." She acknowledged that the injury to the victim's tongue could be indicative of a seizure.

On redirect, Dr. Mileusnic stated that one of the "big problems" that she encountered in this case was the evidence that the victim drowned contrasted with the reports that she was found in the bathtub with her head above water. She added, "for a healthy person to drown, you have to be, again, incapacitated or intoxicated, one of those things, and, again, falling in would account for some injury but not for all of them, and certainly not for fractures that we're seeing." When asked whether someone who had fainted or seized or fallen into a bathtub would later be found sitting upright, Dr. Mileusnic answered, "No." When asked to explain why not, she responded,

> Just because her sitting in the bathtub with everything else that we found, it seems or looks more like a staged scene rather than natural way that she would end up following her trauma and let's say drowning. So to me, looking at some scene that looks staged like that, and staging of the scene is pretty – a common phenomenon in forensic science, is something to be concerned about.

She also explained that water in a bathtub "would buffer a lot of the movement and trauma."

Dr. Murray Marks, Associate Professor at the Department of Pathology and Oral Surgery at the University of Tennessee Medical Center and a board-certified forensic anthropologist, assisted in the exhumation and second autopsy of the victim. He explained that his specific role was "to assess the skeleton and try to make some sense out of trauma if it was discovered." He prepared a written report addressed to Dr. Mileusnic, dated May 1, 2009, that was admitted into evidence. In the report, he notes that "[t]he [victim's] left humerus demonstrates previous removal of the upper end via complete transverse sectioning through the proximal third of the shaft and removal of the head. This specimen was not available for study."[6]

_____

[6] Dr. Stephens' autopsy report reflects that she removed the victim's left "femoral head" for further analysis. Based on the remainder of the record, it appears that her reference to the victim's "femur" was a clerical error and that the autopsy report should have referred to her removal of an upper portion of the victim's left humerus.

In his examination of the victim, he determined that there was a fracture on the front surface of the sternum (breastbone) that was "pushed in from the front." There was also a second fracture further down on the sternum, also caused by pressure from the front. He stated that the types of fractures he found in the sternum "would be something from a direct blow."

As to the victim's right upper-arm bone, the right humerus, he observed an area in the elbow region where the exterior compact bone had been "abraded away," exposing the "[t]rabecular bone" which is "the spongy bone or the cancellous bone that is inside the bones of the skeleton." He stated that, normally, a person's trabecular bone is not visible. He observed a similar injury to the victim's left humerus. He explained the cause of these injuries:

> That type of a wound is received when there's a twisting and particularly of a lower part of the arm and the elbow becomes compromised, and so the proximal ulna and the distal humerus come into contact in this particular case right here so it's twisted off center and then as it's turned on this axis, which is the elbow, it wears down the articular cartilage, it can go right through it and abrade it.

Dr. Marks added that the degree of force required to cause these injuries would be "pretty significant."

Dr. Marks also observed an impact fracture to that portion of the victim's shoulder blade into which the upper portion of the right humerus fit. He stated that this fracture was caused by pressure from the humerus. The upper portion of the right humerus also "was destroyed in a pretty significant manner, it was twisted, fragmented and there was some spiral fracturing on it which means of a twisted nature caused the breakage. It wasn't a simple fracture[,] it was pretty complicated."

Dr. Marks also explained the injuries that he found by reference to some of the victim's actual bones, which were admitted into evidence over the defense's objection. Dr. Marks testified that the fractures that he observed were received "around the time of death."

On cross-examination, Dr. Marks acknowledged that the fractures could have occurred after the victim's death.

Charlie Herron, funeral assistant with Oak Hill Funeral Home, testified that he assisted in handling the victim's body after the initial autopsy. He and Harry Torian retrieved the body from the morgue and transported it to the funeral home. He also "worked the

funeral service." From the time the victim's body was retrieved until it was laid to rest, nothing occurred that would have further damaged the body.

Harry Torian testified that he worked part-time with the Oak Hill Funeral Home, "working services and making removals." He and Charlie Herron retrieved the victim's body from the Medical Examiner's Office in Johnson City after autopsy. The body did not suffer any injury during the removal or thereafter.

Frank Fitzgerald, the embalmer at Oak Hill Funeral Home, testified that he recalled the victim's body because it "had bruises on [the] right and left arm and [the] right and left leg." He also testified that nothing happened to the body after its delivery to the funeral home that would have caused any injury.

Dr. Sam Stout, a biological anthropologist specializing in skeletal biology, testified that he examined a cross-section of a rib bone from the victim's body to determine whether it was osteoporotic. He stated that the cortical bone portion of the sample was "right at the average for a metabolically normal person between the ages of thirty and thirty-nine." His examination did not reveal indications of osteopenic or osteoporotic ribs.

On cross-examination, Dr. Stout acknowledged that, as a forensic anthropologist, he does not make diagnoses of osteoporosis. He explained that "osteoporosis is kind of a potpourri of diseases actually and all [he was] addressing is how much bone."

Robert Casey testified that he was working as a rescue technician on a rescue truck in Johnson City in November 2003. He responded to the call received about the victim. At the scene, he "found a female patient lying supine on the floor, unconscious, unresponsive, with no pulse, no respiratory effort and there [were] two gentlemen on the scene." One of the men, who identified himself as a doctor, was performing CPR chest compressions on the victim. Casey went to the victim's head and began bag-valve mask ventilation. The ambulance crew arrived shortly thereafter and intubated the victim while Casey took over the CPR compressions.

On cross-examination, Casey acknowledged having given a written statement to the police. The statement, admitted as an exhibit, is dated November 20, 2003. The statement provides as follows:

> I received a call to #2 Whalen Ct. on an unconscious female that may have been in cardiac arrest. I was advised that there was a physician on scene. I arrived and the physician's wife met me at the door. She stated, "Go up the hallway and take a right into the bathroom." There was naked w/f in the floor on her back. There was a brown haired w/ man approximately 6' tall in his

40's that I think was a physician and he was doing chest compressions. There was a w/ m with gray or starched [sic] hair in his late 40's-50's with glasses on that was performing mouth to mouth that I think is her husband. The husband stated that he had been in the tub with her. There was a candle burning on the tub in the far back right hand corner. The husband stated he had been out of the tub for 20 minutes. The husband stated he had found her in the tub but not under the water. The husband stated that he had pulled her out of the tub and into [sic] the floor. The doctor stated that when he got there she had a pulse. I checked her pulse upon arrival and found none. I took over CPR and found that she was full of water. The water level in the tub was below the jets. I turned her head to get some water out because she had a lot of water. When I took over CPR the husband went to her feet. He placed a towel over the woman as I was working on her. The ambulance arrived in 2-3 minutes and EMS Capt. Randy Byrd arrived right after them. Paramedic Jason Painter tried to intubate and couldn't because he couldn't see the vocal cords, so he asked for suction. Bob Barrett gave him the yaunkeur [sic] and Jason commenced suction. There was a lot of water that came out of her airway. Jason then attempted to intubate the second time, which was successful. Jason then attempted to bag, but you could hear the gurgling with the chest rising. Jason then requested suction, which was done with a suction catheter. Jason then suctioned additional water out of her lungs that had a little bit of blood in it. Jason pulled the suction out and went back to bagging the airway. We then secured the tube with a tube tamer. ACLS protocol drugs w[ere] then administered. She was then packaged on a long spine board to the cot in the livingroom and then to the ambulance. I don't remember having wet pants or anybody else having wet clothes when we were done. I spoke with the doctor's wife as I was leaving and asked, "What happened?" She stated the husband had come outside to do some yard work and the daughter had asked, "Where's mom?" The husband told her where her mother was. The daughter went to the bathroom and thought her mother was playing. The daughter nudged her mom and she went under the water. The daughter then ran out.

Robert Barrett, an EMT with Washington County/Johnson City EMS, testified that he also responded to the call about the victim. Upon arrival, he found a "thirty-something-year-old female lying supine on the bathroom floor. [He thought] she had a towel over her pelvic area, otherwise, she was unclothed. She was in – she was pulseless, had no respirations, no heartbeat." He and his partner, Jason Painter, "immediately proceeded into ACLS protocol, started IV's, hooked her up to a cardiac monitor." The only unusual thing that stood out in his memory about the call was "there was a half full wine glass in the corner of the bathtub."

On cross-examination, Barrett recalled giving a statement to the police in which he reported the Defendant "talking to his wife trying to get her to come around." He also told the police that "the female didn't appear to have any deformities on her body."

Jason Wayne Painter, a paramedic for Washington County/Johnson City EMS, testified that, when he arrived at the scene, he "found a mid-thirty-year-old female patient lying in the floor and in obvious cardiac arrest. She was pulseless, she was apneic. CPR was underway by a physician that was described to be a neighbor, and apparently the patient's husband." He put a heart monitor on the victim and noted no electrical activity in the victim's heart. He intubated the victim, and he and Barrett

> started the IV and [they] started pushing medications or administering medications for that rhythm. [They] just continued to do CPR and push medications. [They] put her on a long spine board, same thing that [they] put people on for car wrecks for spinal immobilization in order to extract her from that position. [They] got her on the cot, got her to the truck and just proceeded to do just that all the way to the hospital.

Painter reiterated that there were "no signs of life" when he arrived, and he observed no signs of life thereafter.

Painter testified that, during the intubation procedure, they suctioned water out of the victim's airway and that, after intubation, he "had to suction water out of her lungs through the ET tube through the endotracheal tube with a suction catheter." He stated that he did not know how much water he actually suctioned out, "but it was a substantial amount." He emphasized that the water came from the victim's lungs, not her stomach.

On cross-examination, Painter stated that, when he arrived at the scene, the victim's hair was wet. He added that "[t]here was also water on the floor about the head where her head was laying on the carpet" and described the water temperature as "not cold." He confirmed having told the police two days after the event that the doctor who had been there when he arrived had told him that there was a faint pulse when the doctor arrived. He also confirmed having told the police that he "[d]id not notice any abnormal bruising." However, he explained that, because they were working on a cardiac patient, they "weren't really looking for any."

On redirect examination, Painter recalled asking what had happened upon his arrival at the scene. The Defendant told Painter that "he had just gotten out of the bath tub, that he had just taken a bath with her and left her and she was fine." When Painter asked the Defendant how long it had been since the Defendant had seen her, the Defendant replied, "Approximately fifteen minutes."

-20-

James McCoy testified that he was related to the victim and Gentry because his mother was the victim's grandmother's sister. He took his wife and mother to the emergency room after the victim was transported to the hospital. He testified that the Defendant "met us at the door and said she was already gone so then they were saying that she drowned in her bathtub." McCoy's mother accosted the Defendant, stating, "I want to know what happened to Teresa." The Defendant told her that they had found the victim in the bathtub, sitting up, and that she had had a glass of wine and "took a pain pill, maybe even two and he didn't know what happened, if she passed out or what."

Suzanne Payne testified that she had been friends with the victim and the Defendant. After learning of the victim's death, she and another friend, Linda, went to visit the Defendant and Tia. During their visit, the Defendant told her what had happened, explaining that "he and [the victim] had been intimate in the bathtub and were talking and making plans for Thanksgiving, and then he went to pick up Tia." Payne was unsure if the Defendant was picking up Tia from somewhere in the neighborhood or from the school bus. The Defendant told her that, "when he came back, he said he had something to do in the basement, so he sent Tia on up and then Tia found [the victim]."

Sara Rice testified that she knew the victim because her daughter and the victim's daughter had been "best friends for about fifteen years." She stated that she also knew the victim because she had a cleaning service and cleaned for the victim. Rice testified that the victim "was in excellent shape." She described being on the trampoline with the victim and doing acrobatics in the yard together with their daughters.

During the summer of 2004, Rice had a conversation with the Defendant about the victim's death. The Defendant told her that the victim "had an aneurysm and she drowned in the bathtub."

Mary Paige Tate testified that she was a neighbor of the Defendant's and the victim's and that she observed the victim turning cartwheels and playing hopscotch with their daughters. She observed this activity two or three years prior to the victim's death.

Levonia Presley testified that she and her husband raised the victim from the time the victim was about six months old, including putting her through college. The victim was supposed to make a visit to their house on the day of her death. Presley stated that she and her husband paid for the victim's funeral. She also stated that the Defendant never offered to pay for the funeral expenses. The Defendant asked her if the victim's eyes could be donated, but Presley refused. Presley testified that she wanted the exhumation and second autopsy and stated that she was willing to pay for it.

On cross-examination, Presley stated that she did not know about the conversations that her husband had with the Defendant about the victim's funeral.

Lieutenant Steve Sherfey of the Johnson City Police Department[7] testified that he became involved in the case on November 20, 2003, following a call from Dr. Stephens. There had been no police investigation prior to that time. In conjunction with the investigation, he took a statement from the Defendant and collected some drugs from him that he said the victim had been taking. The drugs included calcium tablets and vitamin pills. Photographs were taken of the bathtub. The Defendant's statement, taken on November 25, 2003, provides as follows:[8]

> On 11/18/2003, my wife Teresa had taken her little girl to school. Teresa had gone to a breakfast related to her work, and got home between 9:30 and 10:00 a.m. Between 11:30 a.m. and 1:00 p.m. I was gone from the home. I got home around 1:00 p.m. Teresa got home around 1:15 p.m. Teresa had been under stress due to work. Last month both of the drugs she had sold had been taken off the market (for TennCare). She had been looking for another job. We take baths together for relaxation. We had sex in the tub. Teresa wanted to lay in the tub and relax. She often took hot baths. I had gone downstairs maybe 30-45 minutes. At 2:45, I had gone out to meet our daughter at the bus stop. When I came back up, the little girl asked "Where's mom?" I said that she was upstairs getting ready. The little girl came back out and said that mom was not responding. The tub leaks and the tub had a foot of water maybe. When I got upstairs her lips were purple, and her head was out of the water. I pulled her out and I told Tia (the little girl) to call 911. I saw our neighbor, Dr. Wiles, come in while I was outside. I told Tia to get the doctor. When I got her out, I started CPR, I thought I felt a pulse. After I got her out of the tub, 4 times water came out of her. She threw up one time when I leaned over. The doctor came in and we continued CPR. The medics came in and started CPR. I took a nitro pill due to the CPR. It seemed as though they worked her 20 to 30 minutes. My brother lives nearby and saw the ambulances and drove me to the hospital. This seemed like another 30 minutes. I believe she had eaten breakfast at her breakfast for Merck. Her supervisor is Steve Goodrich, 1409 Bayhill Ridge Lane, Knoxville. She seemed to be in a good state of mind that day other than her job stress. She often had tension headaches. She would have real tight muscular pain in her

---

[7] Lt. Sherfey also was referred to at trial as Detective Sherfey.

[8] A copy of the Defendant's statement was admitted as an exhibit.

head. I do not know if she had taken medications on that day. In May of last year she was put on estrogen patches. She took Zoloft, Xanax, and Ambien to sleep. She was court ordered to go to a psychologist for counseling, Dr. Diebold. His office is below Roundtree. He prescribed her Xanax. She had problems with alcoholism. She had started drinking around 11:00 a.m. There was a wine glass broken outside the tub. I do not know how much she had drunk. She had some female surgery (same-day surgery), the doctor was Julie Markham. My mom had driven us, I had an accident at work and have seizures and do not drive.

There was probably around 30 minutes from the time I last saw her until I got back upstairs. There was probably about a foot of water in the tub when I got out.

Also pursuant to his investigation, Lt. Sherfey obtained several life insurance policies covering the life of the victim which named the Defendant as beneficiary. These policies were issued by Connecticut General Life Insurance Company through the Defendant's previous employer; Prudential Insurance Company of America through the victim's employer; and Fidelity & Guaranty Life Insurance Company. According to Lt. Sherfey, the amounts paid under these policies were $1,000 (from American Income Life Insurance); $25,000 (from Connecticut General); $412,428 (from Prudential); $485,995.50 (from Prudential); $73,995.50 (from Prudential); $214,691.20 (from Fidelity & Guaranty); and $750 (from Connecticut General); for a total of $1,235,181.25.

Also during Lt. Sherfey's testimony, the tape of the 911 call was played for the jury. During the call, Tia is heard crying and telling the dispatcher, "my mom is in the bathtub and she won't wake up!" She then says, "my stepdad just got her out of the water and she won't wake up." A male voice is heard in the background and Tia then says, "bring oxygen, he said" and "he doesn't know what happened." Tia reports that her mother's lips are blue and again states that "he" pulled her mother out of the water. She reports that "he" said that "she has a pulse but she's unconscious." She tells the dispatcher that her mother is not breathing. Leann Wiles also speaks to the dispatcher, stating that her husband, a doctor, is assisting in performing CPR and reports that the victim had a "weak pulse at first."

On cross-examination, Lt. Sherfey explained that he went to Dr. Wiles' house on November 20, 2003, to obtain a statement. He spoke with both Dr. Wiles and Mrs. Wiles and made notes from their conversation. According to Lt. Sherfey's notes, Dr. Wiles told him that the victim was lying next to the tub when he got to the bathroom and began CPR. Lt. Sherfey stated that he may have misconstrued what Dr. Wiles had said, however, and that what Dr. Wiles had meant was that he started CPR after the victim was removed from the

tub.  Lt. Sherfey also acknowledged that, in her call to 911, Tia stated that the Defendant had pulled the victim out of the tub.

As to the life insurance policies, Lt. Sherfey acknowledged that one of the policies was provided by the victim's employer, and that the victim was the beneficiary on policies insuring the life of the Defendant.  One of the policies under which money was paid to the Defendant was a policy primarily insuring the Defendant; the victim was listed as an "additional insured."  He also acknowledged that the Connecticut General and Prudential policies contained an "accidental death" provision and that Prudential paid both the face value and the accidental death benefits.  The insurance policy monies were paid into court following a lawsuit by Gentry on Tia's behalf against the Defendant and the insurance companies.  The lawsuit  subsequently was settled with sums of $500,000 to Tia and $729,560.89 to the Defendant.  The Defendant also divested himself of any interest he had in the house that the victim owned prior to their marriage and placed the deed in a trust for the benefit of Tia.

Lt. Sherfey acknowledged that he took two videotaped statements of Tia, one in January 2004 and one in January 2005.

The State rested its case-in-chief after Lt. Sherfey's testimony.

The Defendant testified that he was fifty-five years old at the time of trial.  Other than this matter, he never had been charged or convicted of a crime.  He continued to live in the home in which the victim had died, a house he had owned prior to their marriage.  He had been married once previously and had a daughter, Whitney, with his first wife.  He had been employed by Sprint for thirty years when he had a car accident involving a head injury, leaving him unable to drive for over a year.  The injury, combined with an earlier heart attack, led to his receiving Social Security disability benefits. He received additional income from several rental properties.

He married the victim in July 2000 after they had been living together for about one year.  Tia, the victim's daughter, also lived with them.  The house in which the victim and her daughter previously had been living became a rental property.  Since the victim's death, that  property was turned over to Tia.  The Defendant retained five other pieces of rental property that he had acquired prior to his marriage to the victim.

During the marriage, the Defendant and the victim refinanced the victim's former house and the rental properties.  The refinancing resulted in five loans and one of the Defendant's rental properties being paid off.  At the time of the victim's death, all of the loans were current and all of the rental properties were occupied.  The Defendant stated,

"The rents from the six made all the payments, plus there was money left over so there was never, never any problem . . . making payments or anything."

The Defendant confirmed that the victim had worked for Merck as a pharmaceutical sales representative and made over $80,000 per year.

The Defendant stated that he had a life insurance policy through Sprint and that the policy also covered the victim. He described the policy as "kind of an automatic thing when you work there." The policy included accidental death benefits. The victim was named the beneficiary on all of the Defendant's life insurance policies. Similarly, the victim was covered under a life insurance policy issued in conjunction with her employment, which also covered the Defendant after their marriage. The Defendant was listed as the beneficiary on the victim's life insurance policies.

When the Defendant and the victim refinanced the rental properties, the victim became concerned about the financial implications and the Defendant's health problems. Accordingly, they obtained an additional life insurance policy from Fidelity & Guaranty in the amount of $200,000. The Defendant was the primary insured at a cost of $305 a month. When they learned that they could add the victim as an additional insured in the same amount for $20 a month, they did so. They were each other's beneficiary. As for contingent beneficiaries, the Defendant designated his daughter and the victim designated Sam and Levonia Presley. The Defendant explained this designation as intended to keep Gentry from Tia's money in the event of the victim's death.

After the victim's death, the Defendant received paperwork from Merck (the victim's employer) by which to make a claim on the victim's life insurance. The Defendant stated that he did not know how much the policy was for at the time. The paperwork he received from Merck indicated that the policy proceeds would be in the amount of $462,000.

After receiving the victim's death certificate, which took several months, the Defendant also made claims under the Connecticut General (Sprint) and Fidelity & Guaranty (private) life insurance policies on the victim. Prior to any proceeds being paid to the Defendant, Gentry sued the Defendant on behalf of Tia for five million dollars. Gentry also sued the insurance companies, claiming the proceeds. Eventually, the insurance companies paid the proceeds into court for further disposition pursuant to the litigation.

According to the Defendant, the victim had fallen on the ice in January 2001, resulting in a fracture to her left humerus near the shoulder. She was treated by Dr. Aiken at Watauga Orthopaedics but still was having problems with it over a year later. The victim also suffered

from gynecological problems including heavy bleeding and excruciating pain. She had surgery for these problems in March 2003. She also suffered from depression.

The Defendant stated that he understood that the victim suffered from low bone density. According to the Defendant, one of the drugs that the victim represented was Fosamax, prescribed for low bone density. In conjunction with her job, the victim had a device that measured bone density in an individual's foot. She provided this device to one of her clients, Dr. John Sherrill, so that he could measure the bone density of his nurses and patients and, if necessary, prescribe Fosamax. The victim also used the device on herself. The Defendant explained that he and the victim were also close friends with Dr. Sherrill and his wife, and the Defendant testified: "I didn't see [the victim] take the test, but I did hear the discussions because Dr. Sherrill's wife also had a very low number when she had taken the test. So I can remember Dr. Sherrill begging both of them to take Fosamax and neither of them would."

At the time of her death, the victim had been looking for another job, in part because TennCare had removed Fosamax and another drug that the victim represented from its formulary. This was going to result in a large pay cut and possibly the loss of her job. After her death, the Defendant learned that the victim had also been "put on report" by her employer for failing to get her paperwork turned in on a timely basis. The Defendant stated that the victim suffered from stress related to her job.

On the morning of her death, the victim had a breakfast appointment for her work. After such an appointment, the victim typically remained to speak with doctors about the drugs she represented and restock the doctors' shelves with samples. The victim returned home between 9:30 and 10:00. At about 11:30, the Defendant's daughter picked him up to take him to lunch. While they were at lunch, the victim took care of some business at a local printing shop. The victim had returned home by the time the Defendant arrived after lunch. The Defendant and the victim took a bath together and had sex. The Defendant left the bathtub and went downstairs at "a little before 2:00." At the time the Defendant left the victim, she had let some of the water out of the tub so that she could refill it with hot water. According to the Defendant, the victim "loved hot baths" and took them regularly. The Defendant told the victim he was going to go outside and do some yard work. The couple had plans to visit the Presleys later that day.

The Defendant raked some leaves and then went to the basement to get the mower. The garage door was up, and he noticed that it was about 2:45. He walked down to the bus stop in order to meet Tia. He met Tia and her friend, Katie, and they walked together back to the house. The Defendant returned to the mower. Tia asked the Defendant where the victim was, and he told her that she was upstairs getting ready for their visit to the Presleys.

According to the Defendant, he remained in the basement for what "seemed like another ten minutes before Tia came downstairs." He continued:

When Tia came downstairs, Tia was not [sic] excited, which it was surprising, because I wasn't in a big hurry. She said, I think her exact words were, "Dale, I can't get mom to answer me." Well, we played a lot of hide and seek and I thought "Well, we're just going upstairs to play another game of hide and seek for her mom." And I followed Tia up and we went into the bathroom. And when I went into the bathroom, my wife was there in the tub up, with her head above water, her lips were quivering and they were blue. I could tell, that was the first sign that I knew something was wrong was by the color of her lips. I knew that there was probably a, you know, a problem because she seemed like she was having a hard time and kind of, not really gasping, but just having a hard time breathing. I immediately pulled my wife out of the tub.

I leaned over, she was there with her hands down. I grabbed her by her wrists, I stood up with her. Her – she was facing me, I had her – it would have been her left wrist in my right hand and her right wrist in my left hand, and I proceeded to get her out. And it was not a – it's like Tia described, it was not just a smooth trying to pick someone up by their wrists and get them out of the tub, it was not a smooth thing.

. . . .

She was – her hair was wet, she was wet and soapy. So the water – she was very slick, and when I picked her up, I know that I dropped her left or it would have been her right wrist slipped out of my hand. I'm right-handed, I was weaker in my left wrist. Her wrist slipped out and she kind of – I know she torqued around, I'm not sure if it was that way or that way, but she torqued around, hit the wall, I got – I kind of moved up against the wall to help steady her to keep her from falling, and got her other wrist back and then used the wall to bring her on out.

Tia saw me do [this]. That was – I mean, it was probably during the time that I was getting, – I mean, as soon as I saw her, I said, "Call 911."

Tia grabbed one of the – it was a cordless phone, I'm not sure if it was in the bathroom there, it probably was because her mother probably had it laying beside the tub somewhere there in the bathroom. She grabbed the phone, she called 911[.]

. . . .

> [A]s soon as I got her out, I know that she was talking to them, and I'm thinking – I'm thinking they had told her or she said they want me to stay on the line. I said, "No, go get David and Leann [Wiles]," because I had just seen them, I knew they were home because they had just passed me fifteen, twenty minutes prior to that.

> She ran and got David and Leann. She did not come back in the house, she stayed outside. Leann kept her outside in the front yard.

When asked if the victim's feet hit the floor as he was extracting her from the tub, the Defendant answered,

> Yes, like I said, she was facing me, and I can remember hesitating when we got to the edge of that tub, she was out of the tub, but her feet were still back. I knew that her feet were going to hit that floor, and they did, it was a very loud thump when both her feet hit the floor.

The Defendant stated that, once he got the victim out of the tub, he began CPR. He testified,

> The first breath that I put into her, she gagged and she threw some water up, and then after and in just a minute, you know, I kept her head to the side because I didn't want to have her head back while she was throwing up. So I turned her kind of on her side and she threw-up and that would have been right at the corner.

The Defendant continued CPR. When Dr. Wiles arrived, Dr. Wiles told the Defendant to stop so that he could check the victim's carotid pulse. When the Defendant stood up, he "had a real tightness in [his] chest." He took a nitroglycerin pill. Dr. Wiles told the Defendant that the victim had a pulse, so Dr. Wiles began doing the chest compressions, and the Defendant ventilated the victim.

The Defendant flatly denied that Dr. Wiles assisted him in getting the victim out of the bathtub. He stated that she was on the floor when Dr. Wiles arrived and that there was not room for him to assist. Referring to a photograph of the tub area which included a yard-stick on the floor, the Defendant stated that the space was less than forty inches wide. Accordingly, the two men moved her two to three feet away from her original position on the

-28-

floor "to where [Dr. Wiles] could be on one side of her and [the Defendant] could be on the other."

The Defendant testified: "I love my wife very much and still do. I would have never done anything that day or any other day to have caused any kind of harm, let alone her death. I would have never had done anything to have hurt her. I loved her very much." The Defendant added that he had not dated since the victim's death.

The Defendant stated that, at the hospital, he was asked if the victim was an organ donor. He did not recall any specific mention of the victim's eyes. The Defendant stated that he deferred the decision to Tia. He also deferred the choice of the victim's casket to Tia and was ready to pay for the funeral. At that point, Sam Presley told him, "No, I want to do that. That's the last thing I can do for her." Accordingly, the Presleys paid for the funeral. The victim was interred in an above-ground crypt. A year later, the Defendant was served with a summons on the lawsuit filed by Gentry.

The Defendant was unaware that the victim's death was under investigation until he was visited at his home by Lt. Sherfey (then Sergeant) and Investigator Matt Howell. They asked him what had happened, and he gave them a statement. He also gave them the drugs the victim had been taking and allowed them to take photographs. He had no further contact with law enforcement until he was arrested on July 19, 2009.

After the victim died, Tia continued to live at their house for approximately five weeks, at which time Gentry came and got her.

The lawsuit filed by Gentry was mediated to a settlement in July 2006. According to the settlement, a trust was set up for Tia in the amount of $500,000 and title to the house previously owned by the victim.

On cross-examination, the Defendant acknowledged having seen the victim turn cartwheels. He described the victim as a "very thin woman." He also stated that they did not have a gym membership, did not have any "cardio equipment," and that their lifestyle was "pretty sedentary."

The Defendant also stated that the victim appeared fine and in a good mood when he got out of the bathtub and left her. He considered her death to have resulted from an accident. He reiterated that he did not kill the victim. He denied hearing a bone break while Dr. Wiles was performing chest compressions. He reiterated that he got the victim out of the

bathtub by himself, before Dr. Wiles arrived. He testified:

> I would not have just stood there with my hands on my . . . hips and waited for that, for him to come and help me get my wife out of the tub. I got . . . my wife out of the tub immediately. And, you know, it wasn't a – it wasn't something I was trying to be slow and gentle with either, sir. I tried to get her out of the tub as quick as I could and try to get some – some help to her because, like I said, her lips were blue and quivering and she was in some type of distress.

He reiterated that he pulled his wife out of the tub by her wrists. He explained that that "was the fastest and best way [he] knew how." He also stated that Tia was in the bathroom during the time he was pulling the victim out of the bathtub.

The Defendant asserted that he and the victim had "a great marriage." The stress that the victim had been suffering from was work-related, not marriage-related.

Eddie R. Lawhorn testified that, between 1994 and 2004, he sold mortgage protection insurance. He met with the Defendant and the victim in March 2002 in order to speak with them about mortgage protection insurance regarding their recent refinancing of some properties. He testified that "[t]he primary concern seemed to be from Teresa that her husband had had heart problems at an early age, which at that time was forty-seven." The couple wanted insurance coverage in the amount of $400,000 for fifteen years. Lawhorn was successful in finding a company willing to issue the policy, with the Defendant being the primary insured. The premium was too high, however, so the Defendant and the victim decided to reduce the policy amount to $200,000 on each of them, with the victim designated as the additional insured. The policy was issued by Fidelity & Guaranty.

Dr. John Sherrill, a family physician practicing in Bristol, Tennessee, testified that the victim had been his Merck Pharmaceutical representative. He also treated the victim on occasion but did not act as her gynecologist. They developed a friendship which extended to their respective spouses. He met the Defendant before the Defendant and the victim were married.

In conjunction with her job, the victim had a Sahara Densitometry Screening Test which was a device into which an individual could insert a foot and get a bone density score. Dr. Sherrill explained, "[A] good score would be +2.5 and if it was 0 it means she's lower and if it's –2.5, those patients are at risk for osteo – well they have osteoporosis." According to Dr. Sherrill, the victim's score was –2.5. He advised her to take Fosamax, to exercise

regularly, and to take calcium supplements.  He described the victim, however, as "a non-compliant patient."

Dr. Sherrill stated that the victim had suffered "two previous fractures, one where she just bumped her – one of the toes, and then the other one, a minor trauma too, she fell holding her husband's arm and fractured her left humerus, proximal humerus."   He stated that the fracture was "indicative of either a low bone mass or osteoporosis in her case, an osteoporotic fracture."

On cross-examination, Dr. Sherrill reiterated that the fracture to the victim's left arm was "very unusual for someone who doesn't have . . . osteoporosis or something."  He acknowledged, however, that he did not witness the fall or treat the fracture.  He added that the victim had other risk factors pointing to osteoporosis:  "she's Caucasian, she was a thin, slender build, she had a very sedentary lifestyle, [and] she used alcohol on a regular basis."  He also stated that, "if you have osteoporosis, you don't take medications, you're never going to get true healing."  He testified that he saw the print-out from the victim's screening test and that he remembered it because his wife at the time had the same score, and the score was "fairly unusual" in young women.  On further questioning, Dr. Sherrill testified on cross-examination, "Ladies and gentlemen of the jury, I believe this young woman had osteoporosis."  He then stated that this was his "professional opinion based on her risk factors and two previous non-traumatic falls."

Dr. Thomas Watson Jernigan, board-certified obstetrician gynecologist, testified that he was the Professor and Interim Chairman of the Department of Obstetrics and Gynecology at East Tennessee State University.  He stated that the defense had contacted him to review the victim's case.  In so doing, he reviewed "a multiplicity" of the victim's medical records and developed a "couple of concerns."  Dr. Jernigan explained:

> I am a person that does a lot of menopause counseling, and one of the things that struck me is that this young lady, thirty-six years of age, had already sustained an endometrial ablation, that is a lining of the uterus which has been ablated to prevent bleeding.  But if you delved further into the discussions both from Holston Medical Group and Dr. Markham, her gynecologist, she had been having hormonal issues throughout most of her time and this may have led to some of the other problems she was having.  One also became concerned about the bone health of the entire body.
>
> . . . .

If one were to look at Ms. Larkin's records over time, one saw that there were hormonal irregularities throughout her adolescence and in her 20's and into her 30's. How does this play a role in bone health? Well, most of us, as we're young kids and then running and playing throughout our adolescence, gain most of our bone density before the age of twenty. And in women, it's very important, because right after that period of time, they start losing bone. And I've tried several ways of putting it into simple terms, but the bottom line is, the running, the active playing, the exercising builds up a deposit and then mother nature sort of slowly takes out that deposit, and over time, all of us end up with weakened bones. But in Ms. Larkin's case, there seemed to be an issue, not only with consecutive or sequential estrogen fluctuations, but enough that led to some irregular bleeding which then led to the ablation. There were times that she didn't have periods, which would indicate to me that she had a problem with having enough estrogen. If you really look in the year 2003, Dr. Markham mentioned several times night sweats, hot flashes which are indicative of a loss of estrogen. Bone needs estrogen. If bone has estrogen, it builds, it actually slows down the resorption. No estrogen, and more bone is lost. That's why we worry about patients who go through a menopause at fifty having difficulty over the latter parts of their life. Well, in this case, that started much earlier.

With regard to the medical findings after the victim's death, Dr. Jernigan testified as follows:

Well, there are a number of things I found important. Let me start with where I am, and I'm a gynecologist first, that's what I look at first. So I looked at a couple of things. First I looked at her female organs and what was going on there. When they had done the endometrial ablation, the burning of the inside of the lining to prevent heavy bleeding, there was an inactive endometrium indicating, again, the lack of estrogen stimulation. Further, the ovaries, at the time of the first autopsy, were very small, smaller than would be anticipated for a young woman. Now that's not an indication of how much estrogen there was, but it's another key. We, as clinicians, look for keys. We try to look at the whole body and then we look at our area and we try to put this together, and this together, and then we come up with a diagnosis and that's how we work. So I looked at that. I also was concerned because she had already sustained a previous fracture . . . on the left arm. And then there were other indications of significant fractures which included the right arm and the sternum, . . . and those concerned me because it went back – and then – so I went back and looked and said, "Could this person have had poor bone health starting in adolescence?" And that's when I started to look at her weight, she

-32-

was Caucasian, she did use alcohol, and she did not take medications consistently[.]

In reviewing the victim's medical records from Watauga Orthopaedics, Dr. Jernigan noted that the victim's "left shoulder fracture was still giving her problems eighteen months after the fracture" and that this concerned him. Dr. Jernigan opined:

> Based on everything that I read, which included Watauga Orthopaedics, which included Holston Medical Group, . . . Dr. Markham's discussion, there's no question that there was a problem with her bone structure, which in clinical terms would be osteoporosis.

On cross-examination, Dr. Jernigan acknowledged that he was not a forensic pathologist and did not analyze the bone tissue of his live patients. He also acknowledged that the victim had been treated with an estrogen patch "as late as October of 2003." He stated that the records he reviewed did not reflect the length of time that the victim had been using an estrogen patch. He acknowledged that he did not know how much alcohol the victim drank. He also acknowledged that, in the medical records that he reviewed, there was "[n]o documentation of osteoporosis."

Dr. Ronald Hamdy testified that he was employed by East Tennessee State University as a Professor of Internal Medicine, the Chair of Geriatric Medicine, and the Director of the Osteoporosis Center. At defense counsel's request, he reviewed the autopsy reports and the medical records of the victim. He testified that, based on recent research,

> [t]he diagnosis of osteoporosis now is based on one of two possibilities. If the patient has sustained a fragility fracture, the diagnosis is osteoporosis. If the patient hasn't sustained a fragility fracture, then you look at bone density and measure the bone density to make the diagnosis. But the presence of a fragility fracture now is diagnostic of osteoporosis.

As to the definitions of fragility fractures, he explained:

> The one that is universally accepted is, it is a fracture that results from a fall that does not exceed the body height. So if a person is walking, trips over something, falls, breaks a bone, this is a fragility fracture. If the person is cleaning the gutters, trips and falls twenty feet, this is a traumatic fracture, it doesn't qualify as osteoporosis. Other definitions of osteo-fragility fracture is a fracture that occurs out of trauma that ordinarily would not result in a fracture. The orthopedic surgeons like to use the term "low energy" or "low

-33-

impact fracture." But it's very important to realize that now, 2011, and it's been going on for a few years now, the diagnosis of osteoporosis can be made just based on the presence of a fragility fracture.

He also explained the differences in cortical and trabecular bone in the context of an osteoporosis diagnosis:

Essentially, most of the bones we have are a mixture of cortical and trabecular bone. If you can imagine the bone in the thigh, it's a very long tubular. The outer shell is the cortical bone, the inside softness is the trabecular bone. Trabecular bone has a very rich blood supply. Cortical bone doesn't have as rich a blood supply, in fact, the amount of blood going to the cortical bone is very much reduced. Our bones are all the time turning over and this is the way we can keep a healthy skeleton. When any part of our bone is injured, even if it is a small bump against a wall, there is a tiny injury. Almost immediately, cells are going to come and resorb the bone that is not healthy, and then, when they are finished resorbing this, other cells are going to come to build that bone. I'm saying this because this depends a lot on the blood supply. Because trabecular bone is so vascular, it responds to anything much quicker than cortical bone, and if you look at what happens normally at the menopause when estrogen is diminished, the first bone to be affected is the trabecular bone. And this is why the young ladies are under menopause when they fall and fracture a bone, it's usually the wrist, which is mostly trabecular. As they grow older, they fracture their vertebrae which contain more trabecular than cortical bone, and when they are in their 60's, 70's and 80's, they fracture their hip because now the cortical bone is also affected. So the very first bone that is affected is the trabecular, and I think this bears a lot on – if you look at the piece of bone after all the soft tissue has been removed, you're only left with the shell, and just looking at the shell, you cannot now say the patient has a lesser quantity than he should have, because this is immaterial as far as a diagnosis of osteoporosis is concerned. The diagnosis of osteoporosis is based on the presence of fragility fractures. If the patient does not sustain fracture, the next best thing we have is to measure the bone density. But we all know that the bone density is not a good representative, a good predictor of fractures, and we've got lots of studies on virtually all the medications we have to treat osteoporosis. When we pick up patients with osteoporosis, we measure their baseline bone density, we treat them, we measure their bone density two, three years later and we see how many patients have fractured. Even though the bone mineral density is the best predictor of fracture, it's not the only one, in

fact, it doesn't predict more than about 60% of the fractures, which means that 40% of the fractures cannot be predicted on the bone mass.

Dr. Hamdy also explained that reduced estrogen, such as occurs with menopause, results in reduced bone mass: "Around the menopause, up to 5% of the skeleton can be lost every year for 2, 3, 4 years which means that over a period of 3, 4 years, the skeleton can lose about a third or a quarter of its bone mass, and then after that, it slows down." He also stated that ovarian dysfunction can contribute to osteoporosis because it results in less estrogen being produced.

With respect to the victim, Dr. Hamdy testified that "the diagnosis of osteoporosis is quite obvious." He cited her fragility fracture in January 2001 when she fell on the ice and broke her humerus. Prior to that, in March 1991, she fractured her right fifth toe after she hit her right foot with a vacuum cleaner. Dr. Hamdy opined that this fracture was "very, very likely to be another fragility fracture or a low trauma fracture." He also noted that, eighteen months after the fragility fracture to her humerus, the victim's "bone has not healed because she had osteoporosis." He also referred to two entries in the victim's medical records, the first in December 1995 and the second in May 2000, that were suggestive of the disease of mastocytosis. Dr. Hamdy stated that mastocytosis "is another condition that leads to osteoporosis." While Dr. Hamdy cautioned that it was not definite that the victim suffered from mastocytosis, the medical records entries were "very, very suggestive of mastocytosis."

As to the fractures to the victim's sternum noted during the autopsy, Dr. Hamdy explained that,

> [i]f a health care professional who's trained in CPR has administered CPR to a person who looks quite healthy, you are going to use as much force as possible because you want to compress the heart. . . . And trained health care professionals know how to differentiate a lady who looks as if she has a fragile bone, from a lady who looks normal. This is easy because of the age of the person. But if you are faced with a person who is in her mid-30's, you have no way of knowing that the bones are fragile and you may use the maximum force because your ultimate goal is let's push whatever blood is in the heart into the brain.

Thus, the autopsy report indicated that the victim's "sternal fractures are consistent with a compressive force applied to the chest as is done in CPR." He added, "[T]he bones are so fragile that pulling the arms may induce a fracture."

Asked about Dr. Stephens' notations in her autopsy that the victim had "no marked osteopenia of the bone," Dr. Hamdy stated that "[one] cannot say for sure the patient has osteopenia or not" simply by looking at pieces of bone. He also questioned Dr. Stephens' notation that "no decrease in [the victim's] bone strength is encountered," asking, "[H]ow did she test it? What sort of bone strength? How did she apply it? And what was she comparing it to?" As to Dr. Stout's observation that, "[i]n terms of cortical area and mean osteon size, the histomorphology of the rib from [the victim] are consistent with a healthy (skeletally) person in their 30's," Dr. Hamdy stated that he had reviewed the rib sections and agreed with Dr. Stout's observations but opined that "they're irrelevant because this lady has sustained fragility fractures." He added, "I've also got big problems that just the ribs were looked at. Traditionally, when we do a bone density test, we look at the two hips, we look at the wrists, and we look at the vertebrae. These are the weight-bearing bones, we in fact don't look at the ribs at all." He continued:

> And one thing that I found very interesting is that it does say . . . Dr. Mileusnic harvested the humerus and where are they and why wasn't microscopic examination done on the weight-bearing bones that were harvested? Why just the rib?. . . It is true, osteoporosis is a systemic disease that affects all the bones, but to various degrees, and if you just focus on one bone, the data is irrelevant.

On cross-examination, Dr. Hamdy reiterated that he could not assess the accuracy of Dr. Stephens' conclusions about the victim's bones because the autopsy report did not set forth the specific data upon which her conclusions were based. He also reiterated that a fragility fracture resulted in a clinical diagnosis of osteoporosis, regardless of microscopic examination of the bones. When questioned about the medical records indicating that the victim had been receiving estrogen therapy, Dr. Hamdy replied that, while he did not measure the estrogen in the victim's body, the medical records reflected that "she doesn't have enough estrogen."

Dr. Jonathan Arden testified that he is a forensic pathologist. On behalf of the defense, he reviewed the victim's medical records and autopsy reports. He stated that, based on his review of the microscopic slides of the victim's ovarian tissue, she "had ovaries that, anatomically looked like they were not functioning." This "open[ed] up the whole question about bone strength and osteoporosis." As to the fractures to the victim's arms, Dr. Arden testified:

> If you look at where they are distributed and the nature of those fractures, they're very much symmetrical, not identical, but very symmetrical. You have a high left humeral fracture, and I'm indicating just my left upper arm just

below the shoulder, the one that Dr. Stephens identified. It had a configuration that you heard described by, I think both Dr. Marks and Dr. Mileusnic, as being a spiral fracture and I concur with that, which indicates a twisting mechanism to make the break. You have a very similar looking fracture on the upper part of the right humerus, not exactly the same location, it was up a little higher but very similar also described and shown in the photos and I agree with what they said that this is a spiral fracture, again, indicative of twisting, yanking of that arm causing the forces to be in the humerus just below the shoulder. You have what Dr. Marks described as grinding fractures or abrasion fractures in the bones on each side of each elbow indicative of one bone rubbing on another and scraping off some of the surface. Again, related to and I hope I'm not mischaracterizing but I think Dr. Marks said relating to a twisting kind of mechanism, and you have that in both elbows on the same bones in both elbows. You also have the one thing that's not perfectly symmetrical, is the – I actually should say one thing's not symmetrical because nothing is perfect in life, but only one shoulder had a little bit of the abrasion in the – in the scapula, the socket where the humerus fits in the shoulder so – but again, both sides, fractures indicative of twisting mechanisms of both arms. So, that to me is the first important thing with those fractures because there's a pattern there. The body is telling us what happened that both arms were yanked and twisted. The other thing that is important to me about the arm fractures, is that the only one of those fractures that was positively identified in the first autopsy, when the soft tissues were still intact, when you still had a good shot at seeing the bleeding associated with a real injury, an antemortem injury, was the left humerus that Dr. Stephens found. And although she describes it as having hemorrhaged, I can tell you that based – first of all, there are no photographs of that internally so I can't assess that independently, there is one microscopic slide that I recall of the left humerus, the area of the fracture. And what was notable to me, is that in actuality, on that slide there is no fracture one showing. I'm not saying there was no fracture in the body, but the sample that was taken did not include a fracture line, and, in fact, it had a small amount of what I characterize as a minimal amount of bleeding. So it – and fractures tend to bleed quite substantially. It had a little bit of bleeding. It didn't show the actual fracture line, there was no hemorrhage into the marrow space where the trabecular bone is that you've seen, the little network or meshwork in there. So the fact that whatever hemorrhage could be demonstrated was really quite minimal, again, to me is indicative of – these are perimortem fractures. And the other arm fractures we don't have the benefit of the soft tissues, they were discovered later after the decomposition process had happened, but interestingly to me that you have these symmetric patterns

of fractures on both arms, in both arms, and you have the one area in which I can assess it, the bleeding is remarkably minimal, which is indicative of a perimortem fracture, not something that happened to a live person with full circulation and blood pressure.

It's significant to me because my interpretation of the arm fractures is that they occurred when [the victim] was pulled out of the tub, at a time when she was either already without pulse or very close to it. We – I was here, you heard from [the Defendant] about how he felt that [the victim] still may have been alive up until the moments before she came out of the tub, that she was having difficulty breathing. So she may have had a heartbeat then. We also know that by the time she is laid down on the floor and resuscitation is started, it's questionable about whether or not a pulse is felt. At some point quickly thereafter, she required CPR, she needs chest compressions, which is indicative of her heart is stopped. So the time when she is pulled by the arms and yanked or jerked, as was said by several of the witnesses out of the tub, there's a time at or around when her heart stopped beating. And so they are significant to me, number one, because I think they're perimortem and perimortem fractures would be appropriate for someone whose heart had already stopped or was just about to stop, and the other significance to me is that going full circle back to where I started in the case in my first inquiries back to you, is that the amount of fracturing that she has in those bones, especially the two spiral fractures of the two upper arms, is much more than I would expect to happen if you take a normal healthy thirty-six-year-old woman, grab her by the arms and jerk her up out of the tub to rescue her. And so that's another thing that is saying to me, "She has weakened bones." I started in the beginning of the case noticing her ovaries, being concerned about them not being functional, being concerned about her having osteoporosis, so that all then comes together quite remarkably.

Dr. Arden also opined that the "best explanation" for the fractures to the victim's sternum was the CPR efforts, based on the characteristics of the cracks themselves and "because there was no hemorrhage associated with those fractures." He explained: "The fact that there was no hemorrhage despite the fact that there are two cracks in that bone, is indicative of this being a postmortem fracture."

Dr. Arden testified that, in his opinion to a reasonable degree of medical certainty,

[A]ll of the fractures of the arms can be explained by the grabbing and jerking motion getting her up out of the tub. The fractures to the sternum are not

-38-

explained readily by getting her out of the tub but they are explained readily by the immediately following CPR. The bruises, if you notice, are scattered in a number of different area[s] of her body. Many of them are overlying what we call "bony prominences." Those are the parts on your body where the bones stick out, places where you are more likely to hit when you fall down. I am motioning on my elbow, things like elbow, knees, over the pelvic bones, or the hip joints where you – your bones stick out, you can hit them if you fall. So many of her bruises were related to areas of bony prominences which is what you hit if you get – if you fall, if you get dropped, that kind of thing.

Some of them were not and some of them were consistent with her being grabbed, for instance, that kind of thing. And just one other small item in terms of the bruises and explaining them, I will also tell you that in two of the bruises that were looked at microscopically, I saw evidence of some inflammation that indicates that those were in the neighborhood of several days old. And so one of the bruises in the scalp, I think it was the right frontal, and the bruise that was described on the outside of the left breast, there was microscopic evidence there that those were actually probably a few days old. So we have to discount those completely from the events in the bathtub and the events of that day in November. But the rest of them could be from grabbing, could be from dropping, could be from the attempts to get her out. There's nothing about those that would not fit with that explanation.

Asked further about the pattern of the victim's injuries, Dr. Arden testified:

[I]f you look at the pattern and the distribution of the injuries around her body, this is not, in my opinion, a pattern of injuries that you see typically in an assault. If you look at the bruises, for instance, as I said, many over bony prominences, which are – nothing is impossible. I'm not saying you can't possibly get a bruise on your elbow during an assault, but look at the overall pattern. Look at things like knees and elbows, look at things like the torso. Look at the ones on the back that are consistent with her being laid down forcefully in order to do CPR. None of those tells me a story that says, "This is what normally happens when somebody gets fatally assaulted by blunt impact. This is what happens when somebody gets beaten to death," and, of course, the rest of the autopsy supports that. Does she have any internal head injuries or brain injuries? No. Does she have any injuries in the face such as common mechanism of assaultive injuries, somebody gets punched in the face? No. Does she have evidence of strangulation? And actually, in my opinion, no, not at all. She has the one little hemorrhage to left of her thyroid

-39-

gland, and I heard Dr. Stephens talk about how that was unusual and she thought that was concerning. I looked at that picture again just last night, and there's a tiny little area of hemorrhage, it doesn't add up to anything, I can't make that into a strangulation. You know, she doesn't have stab wounds, she doesn't have gunshot wounds, you know, that's obvious. Look on the torso. Does she have any significant injuries to the internal organs in her torso as if somebody assaulted her? No. Does she have any internal bleeding that relates to inflicted injuries? No. She only has the one finding in the heart, which is, again, if you look at the microscopic slide, a tiny area of minimal escape of red blood cells. It's so little that it's what you could see with resuscitation, it's what you could see as a what we call a "postmortem artifact." It's not a bruise of the heart. It's clearly not a contusion, so she has no internal injuries. She has no facial injuries. She has no head injuries. She has no brain injuries. She has a pattern that doesn't look like somebody who was killed by blunt impact.

Dr. Arden testified that he disagreed with Dr. Mileusnic's findings and conclusions concerning the cause and manner of the victim's death. While he agreed "that drowning has to be a major consideration here, [he did] not agree that it is proved, as we say beyond a reasonable medical certainty, the kind of standard we use to render a diagnosis or an opinion." He also disagreed that the manner of death was homicide because he did not see "any injuries that . . . could be interpreted to say they were inflicted upon her and caused her death." He emphasized that,

> most importantly, [he did not] see clear-cut evidence as to the cause of death at all. There's very, very valid question here, and you've heard discussion from the witnesses about drowning, about some form of asphyxia, although nobody seems to have an answer as to what kind of asphyxia, how that happened, and if you can't figure out how it happened, I don't think you can say how it happened. I mean, if you don't know how someone was asphyxiated, how do you know if it's an accident or a homicide or what?

He opined that "the best decision for her manner of death . . . is also 'undetermined.'" He added: "We simply can't say, and it's not because I don't want to say, it's because there isn't evidence on which to base such a specific conclusion."

On cross-examination, the State posed the following hypothetical: "had [the victim] been killed, had she went through someone walking in behind her, grabbing her arms, pushing them together and shoving her down in the bathtub, could she not have received all

of these injuries?" Dr. Arden responded as follows:

> Simply pushing her down into the bathtub? I think it's unlikely she's going to receive all of these injuries. Under this hypothetical scenario you've just presented to me, she could receive some of these injuries. But, you know, what you've described to me doesn't sound like something that would have caused the arm fractures, for instance. It certainly wouldn't have caused the sternal fractures. It might have banged her elbows, for instance, but it doesn't – it's not a scenario where you're banging – I'm using the word "bang" meaning where she had impacts to cause bruising both front and back. So it would theoretically explain some of her injuries but not the totality or the pattern.

Asked about the omission from his written report of any analysis regarding the twisting injuries near the victim's elbows, Dr. Arden responded as follows:

> I was really concentrating much more on the fractures of the upper portions, the proximal portions of the two upper arm bones, the humeri. And so, given that those to me, I thought were really more important, that's what I concentrated on. I was aware, of course, of those fractures around the elbow and especially after hearing Dr. Marks testify and describe his interpretation of them, I realize that, although I had omitted them here, they fit in with my original interpretation of the totality of the injuries, which is why I'm discussing them today.

He reiterated that he took these injuries into account when giving his opinion about the victim's injuries during his testimony. He testified that, in his medical opinion, the victim's injuries could have been caused by the manner in which the Defendant testified that he got the victim out of the bathtub.

> When asked if he stood by the statement he made in his written report that nothing he had reviewed suggested foul play or homicide, "given that there was no other evidence of any type of seizure, no evidence of any other type of a fall, anything of that nature, and she was found sitting upright and she obviously had water in her lungs with no other explanation of a medical reason why she died," Dr. Arden responded as follows:

> Actually, yes. She is at that point an unexplained death, something of a mystery. She doesn't have any of the kinds of injuries that I would expect from somebody who was fatally assaulted. As you said that in the predicate to your question, something about no evidence of a seizure, which actually,

-41-

I'm sorry, sir, is incorrect. She does have a bite mark of her tongue which is commonly seen with seizure although there is no – there is no positive anatomical evidence of a seizure . . . . But she did have evidence that is consistent with having had a seizure. There was nothing that was described to me of that scene that suggested a struggle, that suggested an assault, so actually, sir, I still stand by that statement.

Dr. Arden acknowledged that none of the victim's medical records which he reviewed stated a diagnosis of osteoporosis. He disagreed with Dr. Marks' method of testing for osteoporosis, explaining,

the rib is not the ideal bone to use for testing for osteoporosis and, in fact, I've got literature with me from the anthropology community that points out, that taking a single section of one rib is not an adequate survey, even if it's a test that is valid and legitimate. They make the point that for – and specifically, it's published for evidentiary purposes, so this is from the forensic anthropology literature. It says, 'You should not take one section from one rib, there is too much variability within the same rib or rib to rib.'

He added that the examinations performed by Drs. Marks and Stout "don't address the medical question on that issue, and it is a medical question." He added, "The anthropologists aren't here making diagnoses medically."

When asked if he could rule out the victim's death as a homicide, Dr. Arden testified,

As in categorically, 100% exclude? I can't do that for anything, neither can anybody else in this room. There is not 100% certainty in life or medicine. I can tell you that there is some possibility that this was a homicide. I can tell you that there is no evidence on which to base that conclusion with a reasonable medical certainty.

. . . .

It's clearly an undetermined death to me because there is no significant or there is no compelling evidence. First of all, I don't know that she died of asphyxiation. We have one other thing we haven't talked about, at least in my time on the stand here. There was a question raised by Dr. Mileusnic about whether she has myocarditis and we'll never know the answer to that question. That kills people. Some people die from sudden cardiac deaths in the complete and total absence of a pre-existing, long-standing heart disease

-42-

including young healthy people. Some people have seizure disorders that weren't previously diagnosed. Some people slip under the water and drown. We actually don't know that she drowned, for one thing, we also don't know that she asphyxiated. There's no proof positive of asphyxiation here. There's some mildly suggestive evidence that wasn't documented, the petechial hemorrhages. You can see those with heart attacks, and as Dr. Stephens said, people who have violent vomiting. So there is no evidence on which to base a conclusion about what caused this woman to die. And if we don't know what caused her to die, and there's no compelling evidence from the scene and the circumstances about how it happened, whatever it was, then how do we know what killed her? We don't.

The defense rested its case after Dr. Arden concluded his testimony. In rebuttal, the State submitted several pages of notes by Jennifer Parris, a licensed clinical social worker whom the victim saw for fourteen sessions beginning in June 2002 and continuing into December 2002. These notes reflect that the victim reported anxiety, depression, insomnia, panic attacks, and "some marital issues – blended family issues." The intake form, prepared in June 2002, indicates that the victim reported no suicidal or homicidal thoughts. The intake form further reflects that the victim's "goals" were "deal [with] stepdaughter effectively"; "problem resolution"; "stress mgt."; and "coping skills." The final notes reflecting the December 18, 2002, session state, "Family conflict/holiday. Focused on coping."

After deliberating, the jury convicted the Defendant of (1) the first degree premeditated murder of the victim and (2) one count of insurance fraud.[9] The trial court subsequently sentenced the Defendant to life imprisonment for the murder and to a concurrent term of eight years for the fraud conviction. The Defendant filed a timely motion for new trial, which the trial court heard and eventually denied. The Defendant timely appealed.

## Analysis

### *Thirteenth Juror*[10]

The Defendant contends that he is entitled to a new trial because the trial court failed to perform its duty as thirteenth juror. We agree.

---

[9] During deliberations, the trial court granted a judgment of acquittal on one of the two remaining insurance fraud counts.

[10] We have chosen to address the Defendant's issues in a sequence other than chronological.

-43-

Tennessee Rule of Criminal Procedure 33(d) provides that the trial court "may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Tenn. R. Crim. P. 33(d). This Court has described this provision as "the modern equivalent to the 'thirteenth juror rule.'" State v. Blanton, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996). According to our supreme court, "[t]he thirteenth juror rule originated at common law and requires the trial court to *independently* weigh the evidence, pass upon the issues, and decide whether the verdict is supported by the evidence." State v. Moats, 906 S.W.2d 431, 433 (Tenn. 1995) (citing Curran v. State, 4 S.W.2d 957, 958 (Tenn. 1928)) (emphasis added). This fundamental duty requires the trial court to determine *for itself* whether the evidence adduced at trial establishes guilt beyond a reasonable doubt. See id. (citing Manning v. State, 292 S.W. 451, 457 (Tenn. 1927)). The trial court's mandatory review includes an evaluation of the credibility of the witnesses *and* an assessment of the weight of the evidence. See Moats, 906 S.W.2d at 434-35. See also Blanton, 926 S.W.2d at 958 (thirteenth juror rule imposes a duty on the trial judge to "weigh the evidence and grant a new trial if the evidence preponderates against the weight of the verdict").

The reasons underlying the thirteenth juror rule are long-standing, set forth more than one hundred years ago:

> [T]he circuit judge hears the testimony, just as the jury does, sees the witnesses, and observes their demeanor upon the witness stand; that, by his training and experience in the weighing of testimony, and the application of legal rules thereto, he is especially qualified for the correction of any errors into which the jury by inexperience may have fallen, whereby they have failed, in their verdict, to reach the justice and right of the case, under the testimony and the charge of the court; that, in our system, this is one of the functions the circuit judge possesses and should exercise – as it were, that of a thirteenth juror. So it is said that he must be satisfied, as well as the jury; that it is his duty to weigh the evidence, and, if he is dissatisfied with the verdict of the jury, he should set it aside.

Cumberland Telephone & Telegraph Co. v. Smithwick, 79 S.W. 803, 804 (Tenn. 1904).

In short, the crucial purpose of the thirteenth juror rule "is to be a 'safeguard . . . against a miscarriage of justice by the jury.'" Moats, 906 S.W.2d at 434-35 (quoting State v. Johnson, 692 S.W.2d 412, 415 (Tenn. 1985) (Drowota, J., dissenting)). Thus, "the trial court's *approval of* a criminal verdict as the thirteenth juror is a necessary prerequisite to the imposition of a valid judgment." Id. (emphasis added). See also State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995).

In order to satisfy its role as thirteenth juror, a trial court simply may overrule a motion for new trial without comment. In such event, this Court may presume that the trial court approved the verdict as the thirteenth juror. See Moats, 906 S.W.2d at 434; Carter, 896 S.W.2d at 122. When, however, "the record contains statements by the trial court expressing dissatisfaction or disagreement with the weight of the evidence or the jury's verdict, or statements indicating that the trial court misunderstood its responsibility or authority to act as the thirteenth juror," the defendant must be granted a new trial. Moats, 906 S.W.2d at 435-36.

In Moats, the supreme court determined that the trial court misconstrued its responsibility or authority to act as the thirteenth juror and ordered a new trial, id. at 436, based on the trial court's following comments on the record:

> [T]he case was a difficult to try. [sic] There was a great deal of evidence that caused this Court concern, ah, throughout the trial of this case. I am saying that on the record.
>
> Nevertheless, I think that upon reviewing the testimony, and the conclusion of the jury, the Court feels that the jury came to what, ah, was a reasonable conclusion, if they looked at it as the Court feels it must consider that they looked at it . . . . I don't think that the Court can willy-nilly decide that somebody is entitled to a new trial. I think that I have to find that the jury did not have sufficient evidence to conclude what it concluded. I think that in this matter the jury did have sufficient evidence to come to a conclusion along that line. And, ah, I don't feel that it is appropriate for me to overturn that jury's conclusion at this time.
>
> However, for the record, this court has had difficulty with the, ah, with the proof in this matter.

Id. at 433. The supreme court construed these comments as indicating that "the trial court did not believe that the weight of the evidence supported the jury's verdict, but refused to grant a new trial because the evidence was legally sufficient to support the verdict." Id. at 435. Therefore, our high court concluded, "[T]he trial court misconstrued its authority to grant a new trial under the thirteenth juror rule." Id. Accordingly, the defendant was entitled to a new trial. Id. at 436.

In the instant case, the trial court heard argument on the motion for new trial on May 2, 2011. The trial court's comments on that date include the following:

> I guess in my thinking over the last several days, and this case has been on my mind trying to look . . . back and see where a jury could have gone where they – gone where they went, whatever language that is, and I didn't think during that period of time about Mr. Larkin's testimony, for whatever reason I just didn't think about it. And General Brooks is right, the jury had an opportunity to listen to him; had an opportunity to believe him, or disbelieve him. For whatever reason it's apparent they had to disbelieve him. They did not believe what he testified about. It was purely – purely and I mean pure the most circumstantial case that anybody practicing law would ever be exposed to. I – I mean, everything hung upon circumstantial proof. And it's, when you think about it the court probably was thinking that the jury may have a hard time reaching a verdict of guilt in this case maybe because of the way I was thinking at the time, that wasn't the truth – I mean, that wasn't what happened. They – they reached a verdict and they did it – they did it with some emotion.

The trial judge declined to rule as thirteenth juror on that day, however, and continued his final ruling until June 3, 2011. At that time, the trial court ruled from the bench as follows:

> I guess a long time ago when I started practicing law I took a position I didn't always not many times during my life that I probably have not agreed with juries, but we all disagree sometimes and say, well, we don't – we don't agree – I don't agree. I've had some people convicted I didn't think should be, but I've had people acquitted I don't think should have been acquitted. *The problem is when you get one person that puts on a black robe to think that their ability to comprehend, to analyze, and look at the evidence is so much greater than twelve folks sitting in that jury box I don't think is what this system is about. It's – it's about when you – when you see, which very seldom happens, just grave injustice, and you can argue that maybe in this case.* They – they've took evidence of what doctors testified to and that's all this case is all about. That's what made it so unusual. It wasn't – you know, as cases go that we've had through the years it's not anything that you'd sit as a spectator and get excited about like one of those who done it. That's not what this case was. It was about twelve folks taking all that evidence they had and going back there and – and hopefully going through and – and looking at everything. *You've got to understand, as you do, that over there there were twenty-four eyes and twenty-four ears, and here there's two and that's all.* This jury after listening to a well tried case, and when I say a well tried case I mean that,

made a determination that Mr. Larkin committed this offense. You make an argument that's very compelling to me, Mr. Slagle, in the sense that the review on appeal is different from this court's determination of what you've asked me to do. There's a lot of difference between that standard we both know. And that puts Mr. Larkin in a – in a – in a tough situation on appeal as to whether or not they would disturb that verdict. *And I just don't think I'm in a position to disturb it. I don't. I've looked at this thing and, you know, he's – he's entitled to a fair trial. He's not entitled to a perfect trial.* Judges in the best of their wisdom don't try perfect cases. I kind of get amused sometimes when I read about cases and they talk about jurors who did what they did and everything. But, where jurors get where they do is what judges rule on during the course of a trial. That's what an appeal is about, it's not about whether or not a jury was particularly wrong, or not wrong – right in an appeal, but whether a judge did what he was supposed to do wearing a black robe. And I think I've done that in this case. *I – I think he – he got a fair trial.* It wasn't perfect. There's no trial that will ever be. So, I've looked through everything that I've – I've – you've had. *He's had his day in court, and the court's not going to disturb that verdict.*

(Emphases added). The trial court subsequently entered an order denying the Defendant's motion for new trial.

Similar to the trial court's comments in Moats, these comments reflect the trial court's failure to conduct an independent weighing and evaluation of the evidence, including the credibility of the witnesses, as required by the thirteenth juror rule. The trial court clearly was surprised by the jury's verdict, and it struggled to make sense of the verdict by speculating that the jury simply rejected the Defendant's testimony. The trial court itself never made a finding on the Defendant's credibility. Additionally, even if the trial court expressly had agreed with the jury on the Defendant's credibility and found on the record that the Defendant's testimony was not credible, once the court decided to comment, the trial court still had a duty to weigh the various experts' testimony and determine for itself whether the State had proved beyond a reasonable doubt that the Defendant committed the premeditated murder of his wife. The trial court did not undertake this analysis. Instead, the trial judge deferred to the greater number of eyes and ears possessed by the jurors as compared to the number he, alone, possessed.

Moreover, instead of focusing on an independent evaluation of witness credibility and the weight of the evidence as required by the thirteenth juror rule, the trial court focused its attention simply on whether the Defendant had received a fair trial. The legal definition of a "fair trial" is much broader and encompasses many more issues than simply the quantity

-47-

and quality of the evidence adduced at trial. Thus, whether a defendant has received a fair trial is not the issue that must be resolved when a trial court is ruling as the thirteenth juror.

The trial court's general conclusion that the Defendant received a "fair trial" is not an adequate substitute for the trial court's independent analysis of the evidence and witness credibility and its ensuing adoption or rejection of the jury's verdict. It is, in fact, the trial judge's responsibility to "second-guess" the jury's twelve sets of eyes and ears with his or her own single set, because a trial judge's eyes and ears are complemented by his or her "training and experience in the weighing of testimony, and the application of legal rules thereto." Smithwick, 79 S.W. at 804. A trial judge does not satisfy this responsibility by stating that he or she is not in the position to overturn a jury's verdict, nor by concluding that the trial court's rulings during the trial resulted in the defendant receiving a fair trial.

In sum, we hold that the trial court did not satisfy its obligation to act as the thirteenth juror in this matter. Accordingly, we reverse the Defendant's convictions and remand this matter for a new trial.

Although we are reversing the Defendant's convictions on the thirteenth juror issue, we will address several of the Defendant's other issues in light of a possible retrial of the Defendant.

*Dr. Mileusnic*

Dr. Mileusnic originally was contacted about the victim's death by the defense in conjunction with defending the civil proceedings brought by Gentry on Tia's behalf against the Defendant. Following discussion, Dr. Mileusnic agreed to be retained by the defense and to render a professional opinion regarding the cause of the victim's death. For her review and professional analysis, the defense provided her with numerous documents and other materials regarding the victim's death, including the Defendant's statement to the police; the victim's death certificate and subsequent "Delayed Report of Diagnosis"; the County Medical Examiner's Report of Investigation; and the (first) autopsy report and related items. After reviewing these materials, Dr. Mileusnic generated a written report dated May 31, 2006, which concluded the following: "Based on the currently presented evidence, terminal cardiac event with agonal seizure and possible drowning cannot be excluded. In summary, most gross and microscopic findings in support of mechanical asphyxia with blunt trauma are insufficient to be listed as the main cause of death without [sic] reasonable medical certainty." She faxed this report to defense counsel on June 6, 2006. The Defendant utilized the report in the civil litigation. Importantly, there is no evidence in the record that Dr. Mileusnic communicated to the Defendant any reservations about the validity of her opinion.

In spite of her work for the Defendant in the civil case, Dr. Mileusnic began working with the State in its pursuit of the instant criminal charges within days of submitting her report to the defense in the civil case. In April 2010, the defense filed a motion "to exclude Dr. Darinka Mileusnic-Polchan from testifying on behalf of the State" on the bases that (1) "the State of Tennessee through its agents ha[s] improperly violated a confidential relationship and a contractual relationship that the defendant had with Dr. Darinka Mileusnic" and (2) "Dr. Darinka Mileusnic's conduct was improper, that such conduct violated a confidential relationship with Dale Larkin and that her conduct breached her contractual obligation to the defendant." The trial court held a hearing on the motion, at which the following proof was adduced:

Lt. Sherfey testified that he began investigating the victim's death on November 20, 2003, but no charges were filed until July 2009, after the exhumation and second autopsy by Dr. Mileusnic. Lt. Sherfey acknowledged that, prior to that time, the defense had provided him a copy of the report Dr. Mileusnic prepared in her capacity as an expert witness for the Defendant in conjunction with the civil case involving the victim's death. He testified that, after receiving the report, he and "Agent Lott" spoke with the district attorney "in reference to speaking with her about, we were going to set up a meeting in reference to some slides that she had analyzed and some other things that we saw in the report." He acknowledged that the "slides" were ones that had been provided to Dr. Mileusnic by the defense.

Lt. Sherfey stated that he spoke with Dr. Mileusnic on June 22, 2006, in order to set up a meeting between her and the district attorney general. She advised him that she was available to meet with the district attorney on June 28, 2006. According to Lt. Sherfey, Dr. Mileusnic requested at the June 28th meeting "any statements, that kind of thing, that we might have in the case that she didn't have." Accordingly, they provided her with "everything" in their file, including statements. Lt. Sherfey acknowledged that some of the statements contained hearsay and that some were from angry family members casting aspersions on the Defendant and/or his marriage to the victim.

After she had been given the opportunity to review the State's file, Dr. Mileusnic met again with District Attorney General Clark in October 2006. Lt. Sherfey and Agent Lott of the Tennessee Bureau of Investigation also attended this meeting. According to Lt. Sherfey, District Attorney Clark knew that Dr. Mileusnic was the Defendant's witness. Lt. Sherfey testified that Dr. Mileusnic advised them that "she would be willing to pursue it further as far as an exhumation. There was some unanswered questions from the original autopsy that she would like to see." Accordingly, in March 2009, the State filed a petition to exhume the victim's body, which the trial court granted. The petition provided that Dr. Mileusnic had agreed to perform the subsequent autopsy. Based on Dr. Mileusnic's autopsy and Dr. Murray

Marks' report, which Dr. Mileusnic relied upon in conducting the autopsy, the State subsequently sought an indictment against the Defendant.

Dr. Mileusnic testified and acknowledged that she had been approached by the defense about the victim's death. In conjunction with her testimony, several items of correspondence between her and defense counsel were admitted into evidence. The first letter from defense counsel to Dr. Mileusnic, dated April 4, 2005, provided as follows:

> I enjoyed our conversation Friday regarding my pending case in the Law Court for Washington County at Johnson City. As I explained to you on the phone, this case arose from the death of a young woman, my client's wife, in the bathtub of their home in Washington County, Tennessee. I am providing you with a copy of the autopsy report and the statement my client made to the police regarding the incident. My client's neighbor, a neurosurgeon, attempted to revive Ms. Larkin. Obviously his attempts were unsuccessful.
>
> The young girl who found her mother in the tub is now back in the custody of her biological father. Her father is attempting to sue my client to prevent him from recovering over $600,000 in life insurance benefits from three different policies in which Ms. Larkin named her husband as beneficiary. This was listed as a suspicious death. These benefits have not been paid at this time.
>
> I am certain that the State of Tennessee or its expert witness, Dr. Gretel Stephens saved pictures and other evidence from the autopsy. Since the State has decided not to pursue charges against my client in this case, I can obtain their closed file as well as that of Dr. Stephens. Please review these documents and give me a phone call next week so that we may discuss your possible participation in this case as an expert witness on behalf of Mr. Larkin.
>
> Also, after a review of this information, I would appreciate an approximate cost of your services should you be so inclined to take this case. I shall await your reply.

On April 21, 2005, defense counsel sent another letter to Dr. Mileusnic, which stated the following:

> On April 4, 2005, I sent you some information regarding a statement given by my client, Dale Larkin, as well as an autopsy concerning the death of

his wife, Teresa K. Larkin. These documents are the subject matter of a civil lawsuit as no criminal charges were placed. I do not know if you have had a chance to review these documents.

If you have had a chance to review the documents, I would appreciate a phone call or letter from you outlining your review of the documents and whether or not you would be interested in being employed as an expert on Mr. Larkin's behalf in the civil lawsuit brought by the ex-husband of the deceased and biological father of her only child. I would also appreciate you providing me with an approximate cost of your time and work you would need to perform in this case. I would appreciate you contacting me at your earliest convenience.

On May 5, 2005, defense counsel sent another letter to Dr. Mileusnic, which contained the following:

Enclosed you will find a check drawn on our escrow account in the amount of $1,000 to retain your services in the above-captioned civil action. I have explained to my client that you charge $1,000 to review a case, $2,000 to make a report and $500 per hour for additional work. I am going to need a court order to release the pictures and microscopic slides as well as the case file from the Johnson City Police Department. I hope to have that order down in the near future. I must preserve the chain of custody of the evidence at the request of the district attorney general. This will require someone transporting these items other than a member of my firm. I do not know what arrangements you could make to maintain custody of the slides and pictures. I will discuss that with you at the next call.

I appreciate your cooperation in looking into this case. I did discuss with my client how Ms. Larkin was removed from the bathtub. My client said that he grabbed her by the wrist and pulled her from the bathtub on to the floor in the bathroom. I do not know whether that information helps you, but I will have you to talk with my client as soon as possible.

I look forward to working with you on this case.

Dr. Mileusnic acknowledged that she wanted to work for the Defendant to determine how the victim died. She accepted a $1,000 retainer to do so. In conjunction with her ensuing work, she sought and obtained from the defense additional information consisting of forty-four recut slides from Dr. Stephens' autopsy. As to information she received from

the defense that was not noted in her written report, she stated, "There was no additional information regarding that except for maybe a couple of facts about Ms. Larkin and that she had some medical issues, and that she had potentially a drinking problem." She recalled asking defense counsel if the victim had been feeling "bad" or if she had "weak or bad feelings" in an effort to obtain more information about possible heart problems. She recalled learning that the victim had complained of "not feeling well for a while."

Dr. Mileusnic testified that she was contacted by the State after generating her written report for the Defendant. She stated, "I was contacted with additional information with the question, please, could you review additional information because the fact was, I did not have scene investigation available to me originally. So then I accepted to review the additional scene investigation and the medical records." Asked by defense counsel why she agreed to do further work on the matter for the State after having performed work for the Defendant, she responded:

> Well, first of all, you know, I expressed my reservation saying that, number one, I did review the case, and number two, I never submitted complete charge on this case. Except for the retainer I never charged [defense counsel] or his client an additional dime because – and the main reason for that being, because I just did not feel good about the case, because I knew that I did not have complete information. That's number one. Number two, you never called back, you never contacted me, you never asked me whether additional funds were really necessary. I wouldn't have asked for that anyway. And then number three is that I kind of feel an obligation toward the decedent because we are – forensic pathologist essentially speak for decedents, not necessarily for one lawyer or the district attorney or whatever. So I felt obliged that I kind of owed her to review as much information as possible to render a complete opinion that could be as honest as possible.

Dr. Mileusnic also contended that she was "not employed by any particular individual" but by the "people [of] East Tennessee, and particularly Knox and Anderson County tax payers." She added, "after a year or actually two years later, I didn't really feel any obligation to anybody rather than just the victim." Dr. Mileusnic also stated that, initially, she suggested to the State that they hire someone else and that she "basically did express reservation for [her] further involvement."

When asked by defense counsel if she had recommended to the State that someone else do the exhumation and second autopsy "due to [her] connection with [the Defendant],"

she responded,

> Well, first of all, I never met with [the Defendant] and I never met with [defense counsel] until today.[11] As a matter of fact, I never knew what you looked like until today. So I would not – I would really prefer if you wouldn't use my connection or dedication, because there was really nothing except for your thousand dollar retainer and that was a long time paid. . . . And throughout the whole time I did express my reservation whether they're [the State] sure they want me to get involved. And as I said, you know, I speak for the victim. I don't speak for any particular party. And, therefore, they agreed for me to get involved, and I didn't have an issue with it either.

Dr. Mileusnic stated that she was present at the exhumation along with members of her staff. The bill for the second autopsy was $1,300, but she did not know if this bill had been paid. Dr. Mileusnic stated that she saw no conflict in first working for the Defendant and then working for the State, asserting that her work for the State "was unrelated to whatever I did with you." When asked whether she had communicated to the defense her later conversations with the State, she stated that she did not remember.

On cross-examination by the State, Dr. Mileusnic testified that she enlisted Dr. Marks' services and that "his expertise was instrumental in generating the final report and the opinion." She also stated that she did not recall signing "any consulting agreement" with the defense and did not recall any specific conversations with the defense about confidentiality. She, however, also stated, "generally in my business we always try to keep information confidential."

Dr. Mileusnic testified that, after she generated her report for the defense, she was not surprised to be contacted by the State. She also stated that, although she was entitled to $2,000 for the report she generated for the defense, she "never did any billing" because she "did not feel comfortable with the provided information." She added, "Obviously, there was much more to the investigation than just the statement of the involved person." She described the additional information provided to her by the State as follows:

> Well, the new information was the statements from – or actually in our conversation we addressed the statements from the decedent's daughter on how she was found, additional information on the set-up of the bathroom and the bathtub and how – the layout actually of the bathroom, the conversations between law enforcement and the involved individuals, from the physician

---

[11] The Defendant was represented by the same lawyer in both the civil lawsuit and the instant trial.

who performed the resuscitation, all the details, to all the medical records that were available that I requested as far as her previous health and other conditions in which might actually give me a little bit more insight into her overall health.

On redirect, Dr. Mileusnic stated that she had never given the report she generated for the defense "to anyone else" and that she never discussed her conversations with the defense "with anyone else."

After taking the matter under advisement, the trial court later denied the Defendant's motion to exclude Dr. Mileusnic as a witness for the State at the Defendant's criminal trial. The trial court found that no confidential relationship existed between the doctor and the defense. The trial court noted that the report Dr. Mileusnic generated for the defense "was shared with opposing civil litigants, as well as the Johnson City Police Department." The trial court also found that the defense had not disclosed any confidential information to Dr. Mileusnic and that the relationship ended upon the conclusion of the civil proceedings for which she had been retained.[12]  Additionally, the trial court found that the State would have been placed "at a distinct disadvantage" "[i]f they had to go out and get someone else to perform that work." The trial court added, "[I]t's only right I think in this case because I think this is a doctor who actually works for the people of East Tennessee, that's what her relationship is." The trial court ruled,

[B]ased upon all that I just feel that it was appropriate for the State to contact her. She was the appropriate person to contact, and to put the State at some disadvantage because of that would just not be appropriate. More than anything else I find there's no confidential relationship, and I think it's appropriate that the State of Tennessee to use her as the expert in this case.

## Analysis

Generally, we review a trial court's decision to admit or exclude expert witness testimony for an abuse of discretion. See State v. Reid, 91 S.W.3d 247, app. 294 (Tenn. 2002); State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993); State v. McCloud, 310 S.W.3d 851, 864 (Tenn. Crim. App. 2009). The Defendant contends, however, that, under the facts and circumstances of this case, the alleged error is one of constitutional dimension based upon his due process rights. Initially, we note that whether an expert witness retained by a party in civil proceedings thereafter should be disqualified from testifying for the State in a

_____

[12] We note that the Order of Compromise and Dismissal regarding the conclusion of the civil litigation was not filed until August 2006.

subsequent criminal prosecution against the same party appears to be an issue of first impression before this Court. Indeed, our research has revealed no similar cases in either state or federal courts.

Before resolving the issue of whether the trial court committed error in denying the Defendant's motion, we must determine the applicable legal framework a trial court and an appellate court should use for analyzing whether an expert witness who first works for the defendant in a civil matter, and then works for the State in its subsequent pursuit of a criminal conviction of the defendant, should be permitted to testify against the defendant at the defendant's criminal trial. In his opening brief, the Defendant contends that courts should apply a per se disqualification rule to expert witnesses who switch sides. Given the complexity of this issue and the multitude of factual scenarios in which it potentially may arise, we decline to adopt a per se rule of disqualification when an expert witness retained by a party in a civil matter is then retained by the State in its subsequent prosecution of the party.

In the alternative, the Defendant argues for application of the "appearance of impropriety" test, citing Clinard v. Blackwood, 46 S.W.3d 177 (Tenn. 2001). Clinard addresses the disqualification of lawyers, not expert witnesses. Specifically, a lawyer represented Party A while the lawyer worked at one law firm. The lawyer subsequently joined a firm that represented Party B in a lawsuit against Party A. The Tennessee Supreme Court concluded that the law firm representing Party B properly screened the lawyer who had earlier represented Party A so as to protect Party A's client confidences from being transmitted to the lawyers representing Party B. Nevertheless, the court held that the law firm had to be disqualified from representing Party B in the lawsuit on the independent basis of an appearance of impropriety.

The Clinard court emphasized that, in the context of maintaining the integrity of the legal profession, "'the mere appearance of impropriety is just as egregious as any actual or real conflict [of interest].'" Id. at 186 (quoting Lovell v. Winchester, 941 S.W.2d 466, 469 (Ky. 1997)). Thus, the court recognized that, "'[f]or a law firm to represent one client today, and the client's adversary tomorrow in a closely related matter, creates an unsavory appearance of conflict of interest that is difficult to dispel.'" Id. at 188 (quoting Analytica, Inc. v. NPD Research, Inc., 708 F.2d 1263, 1269 (7th Cir. 1983)).

To implement the appearance of impropriety standard, the court suggested several "contours of the rule that aid in its application." Id. at 187. As relevant to the instant case, these contours include the application of an objective standard based on the "perspective of a reasonable layperson." Id. Importantly, application of the standard so as to avoid the appearance of impropriety "is intended to promote public confidence in the legal system."

-55-

Id. Extending Clinard's rationale to apply to expert witnesses, a trial court would be required to disqualify an expert witness on the basis of an appearance of impropriety "in those situations in which an ordinary[,] knowledgeable citizen acquainted with the facts would conclude that [allowing the expert witness to switch sides] poses a substantial risk of disservice to either the public interest or the interest of one of the clients." Id. (internal quotation marks omitted). See also In re McCarter, 296 B.R. 750, 754 (Bankr. E.D.Tenn. 2003) (disqualifying expert witness who sought to testify for one side while employed by the other, noting that courts have the discretion to disqualify expert witnesses "as part of the court's inherent power to preserve the public confidence in the fairness and integrity of the judicial proceedings") (internal quotation marks omitted).

The State does not respond to this argument in its brief but simply asserts that the applicable analysis focuses on two issues: "(1) whether it was objectively reasonable for the party seeking disqualification to conclude that a confidential relationship existed; and (2) whether any confidential or privileged information was disclosed by that party to the expert that is relevant to the current litigation." As with most of the cases cited by the Defendant, in making this argument, the State relies wholly on *civil* cases addressing the disqualification of expert witnesses. See Koch Refining Co. v. Boudreaux, 85 F.3d 1178, 1181 (5th Cir. 1996); Hewlett-Packard Co. v. EMC Corp., 330 F.Supp.2d 1087, 1092 (N. D. Cal. 2004); Mayer v. Dell, 139 F.R.D. 1, 3 (D. D.C. 1991). Even in the context of civil litigation, however, courts have recognized that the courts have an inherent power "to disqualify experts in certain circumstances. This power exists in furtherance of the judicial duty to protect the integrity of the adversary process and to promote public confidence in the fairness and integrity of the legal process." Wang Labs., Inc. v. Toshiba Corp., 762 F.Supp. 1246, 1248 (E.D.Va. 1991) (citing Paul v. Rawlings Sporting Goods Co., 123 F.R.D. 271, 277-78 (S.D.Ohio 1988) and Great Lakes Dredge & Dock Co. v. Harnischfeger Corp., 734 F.Supp. 334, 336 (N.D.Ill. 1990)). See also United States v. Salamanca, 244 F.Supp.2d 1023, 1027 (D.S.D. 2003) (disqualifying government's expert witness from testifying after expert had served as interpreter between defendant and his lawyer because "[a]llowing him to testify would create a conflict of interest and an appearance of impropriety").

In our view, the State's approach is too narrow to address the fundamental fairness concerns inherent in a criminal prosecution. The test advocated by the State is the test used by courts in civil proceedings, which are fundamentally different from criminal prosecutions. Criminal cases, as opposed to civil cases, directly involve the fundamental constitutional liberty rights of the defendant. As a result, our judicial system recognizes significantly more due process protections in criminal cases than in civil cases. For instance, in recognition that our system of criminal justice would rather set a guilty person free than to convict an innocent one, we permit criminal defendants to be convicted only upon proof of guilt beyond a reasonable doubt. See In re Winship, 397 U.S. 358, 372 (1970) (Harlan, J., concurring).

Of course, most civil proceedings are decided on the much lower standard of the preponderance of the evidence. Additionally, persons defending criminal charges are vested with numerous state and federal constitutional rights to ensure a fair trial, including the constitutional rights to legal counsel, to present a defense, and to confront the State's witnesses. See U.S. Const. Amend. VI; Tenn. Const. art. I § 9. Of course, the overarching concern in criminal prosecutions is that the defendant not be convicted except upon being afforded the due process of law, including the right to a trial that is fundamentally fair. See, e.g., State v. White, 362 S.W.3d 559, 566 (Tenn. 2012) ("Due process, at its most basic level, 'mean[s] fundamental fairness and substantial justice.'") (quoting Vaughn v. State, 456 S.W.2d 879, 883 (Tenn. Crim. App. 1970)).

Moreover, as noted by the Defendant, this Court observed almost twenty years ago that "[w]e cannot allow public confidence in the complete fairness and impartiality of our tribunals to be eroded and nothing which casts any doubt on the fairness of the proceedings should be tolerated." State v. Tate, 925 S.W.2d 548, 555 (Tenn. Crim. App. 1995) (quoting Johnson v. McReynolds, No. 35, 1990 WL 204298 (Tenn. Ct. App. Dec. 17, 1990)). We conclude that the analytical framework proposed by the State does not adequately take into consideration the overall fundamental fairness concerns of the criminal trial itself or the public's confidence in the criminal justice system.[13]

First, we are concerned that determining an expert witness' ability to join the prosecution team after working for the defendant on whether there was, in the first instance, an expectation of confidentiality and the exchange of confidential information, completely overlooks the negative impact that an expert's defection is likely to have on the jury's assessment of the defendant's credibility, regardless of issues involving confidentiality. A juror's likely conclusion is that the defendant either lied to the expert or, as Dr. Mileusnic claimed in this case, failed to provide him or her with all of the pertinent information. As noted by one commentator, "a defecting witness . . . creates the appearance of chicanery." Steven Lubet, Expert Witnesses: Ethics and Professionalism, 12 Geo. J. Legal Ethics 465, 476 (Spring 1999); see also Douglas R. Richmond, Expert Witness Conflicts and Compensation, 67 Tenn. L. Rev. 909, 929 (2000) ("An expert's admission that he was originally engaged by the opposing party is potentially devastating [even in a civil proceeding].").

---

[13] Indeed, even the State recognizes in its brief that civil courts addressing the disqualification of expert witnesses "often consider the prejudice to the parties and the policy concerns protecting the integrity of the judicial process," citing Hewlitt-Packard Co., 330 F.Supp.2d at 1092. See also Cordy v. Sherwin-Williams Co., 156 F.R.D. 575, 580 (D.N.J. 1994) (recognizing that the policy objectives favoring expert disqualification include "maintaining the integrity of the judicial process").

Second, we agree with the Defendant that an expert witness' switching sides and opinions after working for the defense places defense counsel at trial in the "untenable position" of both needing to accredit the expert's first opinion while simultaneously needing to discredit the expert's subsequent opinion. A focus on issues of confidentiality completely overlooks this crucial aspect of a criminal defendant's constitutional rights to counsel, to present a defense, and to confront his accusers.

A criminal defendant's due process rights walk hand-in-hand with maintaining the integrity of the criminal justice system and promoting the public's confidence in the system. We hold that these critical concerns – protecting a criminal defendant's fundamental right to a fair trial, upholding the integrity of our criminal justice system, and maintaining the public's confidence – are not satisfied by the expert witness disqualification test applied in many civil proceedings, which focuses primarily on the nature of the relationship between a civil litigant and an expert.

Instead, we hold that a court addressing this issue should apply a modified appearance of impropriety standard similar to the test set forth for the disqualification of attorneys in Clinard. Accordingly, the appropriate test to be applied for assessing whether an expert witness who previously was employed as an expert on behalf of a defendant later may testify as an expert for the State on the same or substantially similar subject matter in a subsequent criminal prosecution of the defendant is whether an ordinary person knowledgeable of all the relevant facts would conclude that allowing the expert to switch sides poses a substantial risk of disservice to the public interest and/or the defendant's fundamental right to a fair trial. Additionally, in making this determination, trial courts should consider the following non-exclusive list of factors: (1) whether the State could have obtained a different expert witness and, if so, under what conditions; (2) whether the defendant hired the expert first in order to preclude the State from using the expert; (3) whether, in addition to switching sides, the expert switches opinions; (4) whether the expert obtained any confidential or privileged information from the defendant; (5) the expert's reasons for switching sides and, if relevant, the reasons for changing his or her opinions; (6) the significance of the issue about which the expert is testifying; (7) the terms of the prior relationship between the defendant and the expert; and (8) the timing of the expert's switching sides.

We further conclude that due process concerns mandate a presumption in favor of disqualification in criminal cases. Unless the record demonstrates that the State clearly has rebutted the presumption in favor of disqualification, the trial court should exclude the testimony of the expert. On appellate review, if the appellate court determines that the trial court erred by allowing an expert to testify, it should apply the constitutional harmless error standard of review, i.e., the appellate court must determine whether the State has demonstrated the error to be harmless beyond a reasonable doubt. See State v. Rodriguez,

254 S.W.3d 361, 371 (Tenn. 2008). If the State has failed to meet this burden, reversal and a new trial will be required. See id.

Applying this framework to the facts and circumstances of this case, we are compelled to conclude that the trial court erred in denying the defense motion to exclude Dr. Mileusnic from testifying for the State. First, we take judicial notice that Dr. Mileusnic was not the only forensic pathologist in the State of Tennessee in 2006. See Tenn. R. Evid. 201; State v. Lawson, 291 S.W.3d 864, 869 (Tenn. 2009) (recognizing that appellate courts may take judicial notice of facts). Indeed, she testified at the pretrial hearing regarding the admissibility of her testimony that, when the State began its efforts to recruit her, she suggested that they contact another pathologist. Further, while we recognize that the trial court found that the State would have been placed at a "disadvantage" had it not been able to employ Dr. Mileusnic, the trial court did not adequately state its reasons for this finding. Dr. Mileusnic had no involvement in this case prior to being retained by the defendant. She was not a fact witness. She did not perform the initial autopsy, nor did Dr. Stephens consult with her in conducting the initial autopsy. In short, the trial court failed to support its conclusion that the State would be placed at a "disadvantage" with any factual findings.[14] Therefore, we hold that the record does not support the trial court's finding in this regard. Accordingly, this factor weighs in favor of disqualification.

Second, the record reflects no attempt by the State to obtain an indictment against the Defendant for his wife's death prior to the time that he hired Dr. Mileusnic to assist in his defense of a civil suit brought against him by Gentry on Tia's behalf. Thus, the record reflects no attempt by the Defendant to secure Dr. Mileusnic's services deliberately in order to create a conflict of interest that would impede her working for the State. Indeed, defense counsel's initial letter of inquiry to Dr. Mileusnic reflects defense counsel's understanding that the State had closed its file after deciding not to pursue criminal charges against the Defendant. Therefore, the record supports the inference that the Defendant had no reason to believe that he should hire Dr. Mileusnic in order to prevent the State from doing so. This factor weighs in favor of disqualification.

Third, Dr. Mileusnic's expressed rationale for switching sides and opinions is less than convincing. Dr. Mileusnic agreed to perform services on the Defendant's behalf, including a review of numerous materials relevant to a determination of how and why the victim died. After reviewing the materials initially provided, Dr. Mileusnic asked the Defendant to supply additional materials, which he did. The record is devoid of any requests to the Defendant from Dr. Mileusnic for additional information such as a description or

---

[14] The trial court stated that it was "only right" that the State turn to Dr. Mileusnic because she "is a doctor who actually works for the people of East Tennessee, that's what her relationship is."

photographs of the bathroom where the victim died, statements from other people acquainted with the victim, or the victim's medical records.[15] Apparently, Dr. Mileusnic was satisfied sufficiently with the materials provided by the Defendant, as supplemented at her request, to render a comprehensive written report containing her analysis and professional opinion concerning the victim's death.

At the hearing, however, she claimed that the defense did not provide her with crucial information regarding the scene or with the victim's medical records. Yet, the record is clear that Dr. Mileusnic never requested a detailed description, drawing, or photographs of the scene. The record also supports the inference that she did not request to visit the scene. Additionally, it is apparent that she based her later conclusions about the hardness of the bathroom flooring on the opinions of others. Also, she could have asked the Defendant for the victim's medical records but did not do so. It is unclear why these records were necessary to her second opinion but not to her first. Additionally, Dr. Mileusnic relied on statements given to the police by persons not at the scene. Again, if Dr. Mileusnic needed such hearsay declarations for the development of her second opinion, it is reasonable to assume that she needed them for her first opinion. Yet, she did not ask the defense to provide her with the names of persons who could provide her with additional information about the victim and/or the Defendant and/or their relationship. Finally, we note that, insofar as the record reveals, Dr. Mileusnic never advised the Defendant of her alleged concerns about the case (other than a single sentence in her report describing the case as "troubling") or her alleged concerns about any lack of sufficient information. As a result, this factor weighs heavily in favor of disqualification.

Fourth, the trial court found that the Defendant had disclosed no confidential information to Dr. Mileusnic and that no confidential relationship existed between the Defendant and Dr. Mileusnic, in large part because the defense voluntarily provided a copy of her initial report to the State. The trial court also determined that the materials provided by the Defendant to Dr. Mileusnic were available to the State. The record supports the trial court's findings. Therefore, this factor weighs against disqualification.

A review of the next relevant factor demonstrates that the issues about which Dr. Mileusnic rendered her conflicting opinions were the key issues in this first degree murder prosecution: the events leading to the victim's death and the actual cause and manner of her death. The only proof implicating the Defendant's participation in the cause and manner of

---

[15] The record reflects that the defense offered to provide Dr. Mileusnic with the State's file which, presumably, would have included the photographs of the Defendant's bathroom taken in November 2003. It is unclear whether Dr. Mileusnic reviewed the State's file while working for the defense and, if she did not, why she did not.

the victim's death came from the State's expert witnesses. The State's key witness in this regard was Dr. Mileusnic. Dr. Mileusnic came to the State's attention only after she had generated a report at the Defendant's request. The State hired her knowing that she had already issued a professional opinion in the Defendant's favor. The State then convinced her to assist the prosecution in demonstrating that the Defendant was responsible for the victim's death. The State's strategy in "flipping" a defendant's expert witness and then exploiting that fact to the jury became clear during its closing argument, when the prosecutor argued the following:

> Look at Dr. Mileusnic, she once did get retained by [the defense] regarding this case. She produced a report. She has talked about that report, she has explained it to you, ladies and gentlemen, why her opinions changed, how new information in this case led to a different report on her part, but what about the money trail on her, okay? [The defense] introduced a letter that he'd written to her where he'd paid $1,000 retainer for her to look at the case and said "You'll get $2,000 for a report," okay? What was her testimony about the $2,000 for the report? She issued the report, ladies and gentlemen, but she told you she never sent the invoice in. She never sent the invoice in because she told you "I never felt totally comfortable about this case." So later on when Lieutenant Sherfey contacts her, begins a dialogue, she agrees to do an exhumation. She agrees to put in all of this work into this case and for what, a $1,300 check? As you consider what Dr. Mileusnic said to you, I want to suggest you ask yourself a question. When Lieutenant Sherfey brought this topic up to her, what would have been the easiest thing to do for that woman if she was just about money and not about seeking out the truth of this woman's death? Ladies and gentlemen, the easiest thing she could have done was to have sent that invoice to [the defense], get her $2,000 that she'd already earned for writing a report. The easy thing to do is not to take $1,300 instead, look at this body, do all that work, and then write a report that she had to have known she was going to be grilled about, questioned about. In your own experiences, who do you trust more; someone who comes to a conclusion and won't change it no matter what else is brought before them, or someone who is willing to reconsider their opinions in a matter?

This factor also weighs heavily in favor of disqualification.

As to the terms of the initial relationship between Dr. Mileusnic and the Defendant, we agree with the trial court that there does not appear to have been a clear breach of confidentiality, particularly in light of the defense providing a copy of Dr. Mileusnic's report to the State. This factor weighs against disqualification.

The timing of Dr. Mileusnic's defection is particularly troubling. Within mere days of delivering her favorable report to the defense, she was consulting with the State in its pursuit of a murder conviction of the Defendant. The record reflects no effort on her part to warn the defense of her defection. Indeed, nothing in the record suggests that she ever communicated to the defense any concerns she may have harbored about foul play. Rather, once she delivered her report to the defense, she immediately became amenable to a complete reversal of her professional opinion on behalf of a party adverse to her client. This factor weighs heavily in favor of disqualification.

In summary, we conclude that the totality of these factors weighs heavily in favor of disqualification. We hold that an ordinary person knowledgeable of all the relevant facts in this case would conclude that allowing Dr. Mileusnic to switch sides and testify for the State posed a substantial risk of disservice to the public interest and to the Defendant's fundamental right to a fair trial. Moreover, the State clearly failed to rebut the presumption in favor of disqualification. We also are constrained to hold that the State has failed to demonstrate that the trial court's error in denying the defense motion to exclude Dr. Mileusnic was harmless beyond a reasonable doubt. The State may establish that a non-structural constitutional error is harmless only when "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Rodriguez, 254 S.W.3d at 371 (quoting State v. Allen, 69 S.W.3d 181, 190 (Tenn. 2002)) (internal quotation marks omitted). In our view, the jury obviously relied heavily on Dr. Mileusnic's testimony in rendering its verdict. Indeed, Dr. Mileusnic's testimony clearly was critical to the State's case. Because the admission of Dr. Mileusnic's testimony was constitutional error which has not been demonstrated to be harmless beyond a reasonable doubt, the Defendant must be afforded a new trial. See id.

*Refusal to Sequester Jury*

The Defendant also argues that the trial court committed error in refusing to grant his request for a sequestered jury. We disagree.

Tennessee Code Annotated section 40-18-116 provides that, "[i]n all criminal prosecutions, except those in which a death sentence may be rendered, jurors shall only be sequestered at the sound discretion of the trial judge, which shall prohibit the jurors from separating at times when they are not engaged upon actual trial or deliberation of the case." Tenn. Code Ann. § 40-18-116 (2003, 2006). Thus, this Court reviews a trial court's ruling on a motion to sequester for abuse of discretion. See State v. Larry Walcott, No. E2004-02705-CCA-R3-CD, 2005 WL 2007203, at *6 (Tenn. Crim. App. Aug. 22, 2005), perm. app. denied (Tenn. Feb. 6, 2006). This Court also has recognized that "'the failure to sequester a jury standing alone could rarely, if ever, constitute reversible error. A defendant would

have to demonstrate actual prejudice or at least substantial likelihood thereof flowing from the failure to sequester in order to warrant a new trial.'" State v. John Fred Howard, No. W2008-00208-CCA-R3-CD, 2009 WL 1034506, at *8 (Tenn. Crim. App. Apr. 17, 2009) (quoting United States v. Johnson, 584 F.2d 148, 155 (6th Cir. 1978)).

In this case, the Defendant contends that the trial court's refusal to sequester the jury resulted in the jury's being exposed to a prejudicial comment from the public. Specifically, during one of the jury's lunch breaks during the defense case, someone in the restaurant told the jury, "Hang 'em high." One of the jurors reported this incident to the trial court upon the jury's return from lunch. The trial court responded by stating to the jury, "I trust from that comment that that means nothing to you or any of you for the record." The juror who reported the incident responded, "Right." The court continued: "And I trust that you all didn't talk about it or hear any news events or anything. How was the bus, pretty good? Pretty good buses?" The juror responded, "Pretty nice." Defense counsel said nothing during this colloquy. When the trial court said, "Call your next witness," the defense called its next witness.

Obviously, a trial court has no way of knowing that a member of the public will speak inappropriately to a jury during a jury's lunch break. The only way definitively to protect a jury from such commentary is to order sequestration. Clearly, however, not every jury must be sequestered. Rather, we trust trial courts to assess the likelihood of improper contact and to render a decision regarding sequestration accordingly. Based upon the record before us, we conclude that the trial court did not abuse its discretion in refusing to sequester the jury.

Moreover, our research reveals that reviewing courts have found no abuse of discretion by a denial of sequestration even where the jury is subsequently exposed to far more egregious commentary than was present in this case. For instance, in State v. Andrews, 576 P.2d 857 (Utah 1978), a juror turned over his napkin during his lunch break to find "a drawing of a stick figure hanging from a gallows and an inscription reading 'Hang the n*****s.'" Id. at 858. Upon learning of this incident, the trial court instructed the jury, "Occasionally some foolish person will try to communicate with you. Please disregard the communications from foolish persons and ignore the same . . . . Just ignore communications from foolish persons." Id. at 859. The Utah Supreme Court concluded that

> no actual prejudice was demonstrated showing that the jury was influenced adversely and there was no showing that sequestration would have eliminated this incident. Indeed though the jury was not generally sequestered, it was sequestered at this recess. We believe that the professional manner in which this unfortunate incident was handled by the jurors, the bailiff, and the Court negates the probability of actual prejudice.

Id.  See also Andrews v. Shulsen, 600 F.Supp. 408, 419 (D. Utah 1984).

Similarly, in Tremayne J. Collier v. Anthony Hedgpeth, No. C 07-5964 SI (pr), 2009 WL 2460940 (N.D.Cal. Aug. 10, 2009), the defendant claimed that the trial court "violated his right to a fair trial when it denied his motion to exclude [a juror] because of her exposure to improper third-party communications." Id. at *3.  The juror had reported that two of her co-workers had exhorted her to "[b]urn" the defendant and to "hang 'em high." Id. at *4.  The reviewing court set forth the following factors to be considered in determining whether improper communications between jurors and third persons requires a guilty verdict to be reversed:  "[1] whether the unauthorized communication concerned the case, [2] the length and nature of the contact, [3] the identity and role at trial of the parties involved, [4] evidence of actual impact on the juror, and [5] the possibility of eliminating prejudice through a limiting instruction." Id. (citing Caliendo v. Warden of California Mens' Colony, 365 F.3d 691, 697-98 (9th Cir. 2004), and Dickson v. Sullivan, 849 F.2d 403, 405 (9th Cir. 1988)).  Applying these factors, the court concluded that the defendant had not demonstrated that the third-party communication had tainted the verdict and, therefore, denied habeas corpus relief. Id. at *4-5.

Here, it is unclear how many of the jurors heard the third-party communication.  Certainly, it was brief.  There is nothing in the record to indicate that the speaker had any connection whatsoever with the case.  The colloquy between the trial court and the reporting juror indicates that the juror was unaffected by the comment.  Nothing in the record demonstrates that any other juror was affected to the Defendant's prejudice.  Indeed, defense counsel apparently discerned no need to pursue the matter further, either through additional voir dire of the jury, by requesting additional instructions from the judge, or by requesting a mistrial.  Moreover, prior to the jury leaving for its lunch break, the trial court had delivered the following admonishments:

> [T]hey're taking you out to Cracker Barrel, enjoy that meal.  And remember you can't talk or discuss this case.  I'm hoping the officers – let me just caution the officers a little bit.  They're going – listen to me a minute.  They're going to be – listen to me a minute.  They're going to be in the public and, you know, there's publicity on this case, so just make sure that there's no conversations in or around them.  If you folks hear of somebody mention this case, please let these officers know so they can ask them politely not to do that or something.  Just please, we're getting close to home, let's don't do anything that might create a problem.  So just – I know you won't do that purposefully.  It's a little spooky sometimes when we expose you to the public again.  So have a good lunch, okay?

By reporting what it had heard during lunch, the jury demonstrated its commitment to follow the trial court's instructions. Additionally, this Court presumes that a jury follows its instructions. See State v. Gann, 251 S.W.3d 446, 463 (Tenn. Crim. App. 2007).

In short, we hold that the Defendant has failed to demonstrate that he suffered any prejudice as a result of the trial court's denial of his request that the jury be sequestered. The Defendant is entitled to no relief on this basis.

As to the Defendant's assertion that, "[e]ven if it was not error to refuse to sequester the jury initially in this case, the judge should have investigated more thoroughly the comment made to the jury while at lunch," we hold that this issue is waived. The defense requested no additional questioning by the trial judge and did not request to conduct its own questioning. This Court is not required to grant relief when a defendant "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). The Defendant is entitled to no relief on this basis.

*Admission of Victim's Bones*

The Defendant contends that the trial court committed reversible error when, over the Defendant's objection, it allowed the State to introduce through Dr. Marks some of the victim's bones, specifically her right humerus, sternum, and forearm. During a jury-out hearing regarding the admissibility of these items, Dr. Marks demonstrated with the bones several injuries that the victim had suffered. The trial court ruled that the bones were admissible, noting that they were "clean" and that there was "nothing inflammatory" about them. The trial court added that they

> are just dull, brown bones. She's dead and everybody knows she's dead. They
> know that they took these bones and did what they did. They've had pictures
> of everything. They've seen, and I think it's just for their benefit and for your
> experts' benefit, these bones are the best way they can go about that.

As the basis for its ruling, the trial court stated, "[B]ecause of the nature of this case, I think that its probative value of it far outweighs any prejudicial [effect]." The court added, without objection, "I will tell the jury that they do not have to pick them up, they don't have to do anything, they'll be provided with gloves in the event they care to look at those things."

Generally, we review issues regarding the admissibility of evidence under an abuse of discretion standard. State v. Looper, 118 S.W.3d 386, 422 (Tenn. Crim. App. 2003) (quoting State v. James, 81 S.W.3d 751, 760 (Tenn. 2002)). We will find that a trial court abused its discretion in admitting or excluding evidence "only when the trial court applied

incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008) (citing Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)). See also Looper, 118 S.W.3d at 422.

As with all evidence, the threshold inquiry is the proffered proof's relevance. See Tenn. R. Evid. 401, 402. If the proof has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," then it is relevant. Tenn. R. Evid. 401. Here, the State proffered the victim's bones to demonstrate the injuries she had sustained and to explain how the injuries were inflicted. We agree with the trial court's assessment that the bones were relevant.

Even if relevant, however, evidence may be excluded "if its probative value is *substantially* outweighed by the danger of *unfair* prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403 (emphases added). Our supreme court has declared that evidence is unfairly prejudicial when it has "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." State v. Mitchell, 343 S.W.3d 381, 389 (Tenn. 2011) (quoting State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978)). Relevant evidence also may be excluded upon "considerations of . . . needless presentation of cumulative evidence." Tenn. R. Evid. 403; see State v. Farner, 66 S.W.3d 188, 210 (Tenn. 2001) (holding that trial court abused its discretion in admitting computer animated visualization of accident, in part because the animation depicted the accident fifteen times at various speeds). Additionally,

> Rule 403 is a rule of admissibility, and it places a heavy burden on the party seeking to exclude the evidence. Excluding relevant evidence under this rule is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion.

State v. James, 81 S.W.3d 751, 757-58 (Tenn. 2002) (citation and internal quotation marks omitted).

The Defendant contends that the bones were of a "horrific nature" and that their admission was unnecessary in light of witness testimony, diagrams, and photographs. That is, the Defendant argues that the trial court should have excluded the bones on dual bases: (1) that they were unfairly prejudicial; and (2) that they were needlessly cumulative. We disagree with both contentions.

First, our supreme court has ruled on multiple occasions that a victim's skeletal remains may be admissible when relevant. See, e.g., State v. Robinson, 146 S.W.3d 469, 489-92 (Tenn. 2004) (cleaned and reconstructed skull); State v. Pike, 978 S.W.2d 904, app. 925 (Tenn. 1998) (cleansed and reconstructed skull); State v. Cazes, 875 S.W.2d 253, 263 (Tenn. 1994) (cleaned and reconstructed skull); State v. King, 718 S.W.2d 241, 250-51 (Tenn. 1986) (skull fragments); State v. Morris, 641 S.W.2d 883, 888 (Tenn. 1982) (cleansed skull). Clearly, a victim's bones are not so inherently "horrific" as to require their exclusion regardless of their relevance. In this case, the several bones admitted were years old. They were dry and clean. Dr. Marks was able to show the jury several of the victim's injuries by pointing out fractures on the bones themselves. While there were also photographs of these fractures, we recognize the value that a three-dimensional image has over a two-dimensional one. Dr. Marks also was able to demonstrate how the victim's arm bones fit together and how some of her injuries may have been caused through the interaction of the bones. The Defendant's vague assertions that the bones were, in and of themselves, unfairly prejudicial are unpersuasive. We hold that the trial court did not err in ruling that the probative value of the bones was not substantially outweighed by the danger of unfair prejudice.

We also uphold the trial court's ruling that the admission of the bones did not constitute the needless presentation of cumulative evidence. As set forth above, Dr. Marks was able to demonstrate physically the victim's injuries with the bones. He was able to show the jury how the bones fit together and the physical mechanisms necessary to cause the injuries. While Dr. Marks also utilized photographs, the bones provided him with, in essence, a working model that he was able to manipulate and use to further explain his testimony. In short, the bones were not merely cumulative to other proof in the record. Rather, the bones constituted unique and highly relevant evidence. We hold that the trial court did not err in failing to exclude the bones on the basis that they were needlessly cumulative. The Defendant is entitled to no relief on this basis.

*Admission of Autopsy Photographs*

The Defendant also contends that the trial court committed reversible error in admitting two photographs taken during the second autopsy. We have examined these photographs, the second of which is a close-up of the same area shown in the first, and acknowledge that they depict discolored, decaying flesh and insects. Each photograph also depicts a small, but deep, incision that is being held open with forceps. Over the Defendant's objection, the trial court ruled that the photographs were admissible because they were relevant to proving the victim's injuries and were not inflammatory, explaining that the jury "kn[e]w this lady has been in the ground for a long period of time." The trial court added that "[t]here's nothing, when you look at them that you would not expect to see."

The two photographs were admitted during Dr. Mileusnic's testimony,[16] and she explained that they were of an area near the victim's buttocks. She testified,

The muscle now is kind of brown, salmon-brown in color and that is because of prolonged postmortem interval and because of the preservation of the body with embalming. The clusters that we see here are actually the maggots, so unfortunately, it was one of the things that we noticed that the maggots did infest the body in that vault and changed appearance of the front of the body. The back of the body was not so bad. As a matter of fact, the embalming fluid was saturated – tiles [sic] of embalming fluid were enveloping the back of the body so a lot of soft tissue was still pretty well preserved on the back. As we went deeper into the back muscles, and that's something Dr. Stephens already looked at to some extent, we just went a little bit deeper, we noticed a couple of other deeper focus of hemorrhage or bleeding under the skin and in the muscle.

Referring to the close-up photograph, Dr. Mileusnic testified, "this is the deep intramuscular hemorrhage that we uncovered as we were cutting into the muscle in the area of the buttocks." She explained that this was a "deep force hemorrhage" and that it would not have been visible on the victim's skin by eyesight.

The Defendant argues in his reply brief that a proper reading of State v. Banks, 564 S.W.2d 947 (Tenn. 1978), requires this Court to find reversible error in the trial court's ruling. We disagree. The Defendant reads Banks as "requir[ing] exclusion of gruesome autopsy photographs unless the state establishes that the probative value and relevance outweigh their inherent prejudicial effect," labeling this test as "the opposite of the traditional balancing test, which allows the admission of relevant evidence unless the danger of unfair prejudice 'substantially outweighs' the probative value of the evidence." This construction of Banks overlooks the fact that Banks was decided before the adoption of the Tennessee Rules of Evidence. What the Defendant is labeling as "the traditional balancing test" is, in fact, the test set forth in Tennessee Rule of Evidence 403. The test set forth in Rule 403 is the test applicable to this issue. Banks does not create an exception or a modification to the balancing test of Tennessee Rule of Evidence 403.

We acknowledge that the Banks court opined that photographs "made during or after an autopsy are most often [excluded] because they present an even more horrifying sight and

_____

[16] Although we have concluded that Dr. Mileusnic may not testify for the State in this matter, we address this issue in the event that, on retrial, the State establishes that the two photographs are admissible through another witness.

show the body in an altered condition and because lay jurors normally do not have the experience necessary to draw correct inferences from the appearance of internal organs." Banks, 564 S.W.2d at 951 (citations omitted). The Banks court also recognized, however, that photographs of a victim's corpse are generally "admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." Id. at 950-51. The Banks court then adopted Federal Rule of Evidence 403 as the appropriate test: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Id. at 951. This is the same language included in Tennessee Rule of Evidence 403, adopted after the Banks decision. Since Banks, our supreme court has upheld a trial court's admission of autopsy photographs on numerous occasions. See, e.g., State v. Cole, 155 S.W.3d 885, app. 912-13 (Tenn. 2005); State v. Hall, 958 S.W.2d 679, 708-09 (Tenn. 1997); State v. Smith, 868 S.W.2d 561, 575-76 (Tenn. 1993).

We acknowledge that the disputed photographs are unpleasant. However, they are unpleasant primarily because of the length of time the victim had been deceased, not because of the injuries being displayed. The jury knew that the Defendant was not responsible for the discoloration, decay, or insects visible in the photographs. Therefore, the trial court did not abuse its discretion when it concluded that the probative value of these photographs was not substantially outweighed by the danger of unfair prejudice to the Defendant. Accordingly, the Defendant is entitled to no relief on this issue.

*Limitation on Cross-Examination of Dr. Stephens*

The Defendant contends that the trial court committed error when it prohibited the Defendant from cross-examining Dr. Stephens about a reprimand she had received from the State of Tennessee Department of Health regarding her Tennessee medical license and her failure to indicate the reprimand on the curriculum vita ("CV") which she filed with the court. The State disagrees.

The trial court allowed the defense to voir dire Dr. Stephens about this issue during a jury-out hearing prior to beginning its cross-examination of her. She testified that she began working at ETSU in the forensic pathology department on July 1, 1998, and stayed until June 27, 2005. When asked about the circumstances of her leaving, she testified,

> I was offered a contract because the workload, since I was the only forensic pathologist doing it for quite a considerable period of time, my reports became very long on being finished. The department chairman offered me a contract for the next year with it written in there that I should finish ten reports a week but not stipulating how many autopsies I was to do at the same time. That was unacceptable to me so I looked elsewhere.

I did not accept the contract and I looked elsewhere.

She testified that she subsequently learned that she "was being investigated because reports, photographs and tissues had been found at a home that [she] had vacated back in 1998." When asked to explain the written reprimand she received from the State of Tennessee, she testified,

> The materials in question had been at the home. It was tissues from a dog autopsy on one of my pets. It was microscopic slides of peripheral blood smears from a laboratory with whom I had consulted after leaving Nashville and it was reports that I was given both by the Davidson County Medical Examiners Office and outlying county medical examiner reports that were autopsy reports and reports of investigation by county medical examiner that I had prepared on autopsies that I had done. Since Davidson County in 1994, under a new forensic pathologist medical examiner had breached my contract, the only place I had to meet with attorneys and prosecutors on cases that were going to court in those counties, was at my home. These reports were then returned to my husband at that time, Dr. Charles Harlan, who was at the time the Chief Medical Examiner for the State of Tennessee. By the time he vacated the home after I had vacated the home and divorced him, these reports were still in the home. The new tenant in the home found them, turned over the reports to Dr. Bruce Levy, who was in active attempt to remove my former husband's medical license and he took those to the media.

She stated that she received the notice that a hearing was being held on this matter only two days before the scheduled hearing because she since had moved and the notice was sent to her old address. She did not attend the hearing due to the short time frame. She subsequently "accepted the reprimand, paid the fee, kept [her] Tennessee license until it was due to be renewed and asked that it be retired." By this time, she was working in Ohio and had no plans to return to Tennessee. She added that, after the reprimand, she had to defend her Ohio license. When the trial court inquired about the outcome of that proceeding, she testified, "I still have my Ohio license. They said they would not pursue it further." She admitted that she had not placed the reprimand on the CV that had been filed as an exhibit to her testimony. She explained the omission: "Because I was still licensed by the State of Tennessee to practice until after the reprimand. I was the one that requested that my license be retired."

The trial court ruled that the defense would not be allowed to explore this matter on cross-examination because it was not relevant. The Defendant now argues that his ability to cross-examine Dr. Stephens about the reprimand was crucial to impeaching her and that it

was relevant because "it related to Dr. Stephens' potential partiality and established that Dr. Stephens had a motive to testify favorably for the state in order to ameliorate the effects of her prior reprimand." He asserts that "[t]he jury was entitled to know that Dr. Stephens had been reprimanded by the same entity that was prosecuting [him] in order to evaluate whether her testimony might be affected by a desire to mend her damaged professional reputation and repair her prior relationship with the state." We are not persuaded.

We acknowledge, of course, that "[p]roof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." United States v. Abel, 469 U.S. 45, 52 (1984). Thus, "[a] defendant's right to examine a witness to impeach his or her credibility or to establish that the witness is biased includes the right to examine a witness regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness." State v. Rice, 184 S.W.3d 646, 670 (Tenn. 2006). Here, however, the Defendant's attempt to demonstrate that the reprimand issued by the State against Dr. Stephens somehow predisposed her to bias *in favor of the State* rings hollow. Dr. Stephens explained that she had chosen to retire her Tennessee medical license. There is no proof in the record that she had any plans to seek the reissuance of her license. On the basis of the record before us, it is entirely speculative that Dr. Stephens was biased in favor of the State. Indeed, it appears from our review that Dr. Stephens might more reasonably have been expected to show prejudice *against* the State. Accordingly, we hold that the trial court did not abuse its discretion in ruling that the defense could not cross-examine Dr. Stephens about the reprimand in an attempt to prove bias.

The Defendant also argues that the trial court erred in not allowing him to cross-examine Dr. Stephens about her failure to reflect the reprimand on her CV. The State's brief is silent on this point.

Tennessee Rule of Evidence 608(b) provides for the circumstances under which a party may cross-examine a witness about specific instances of the witness' conduct "for the purpose of attacking . . . the witness's character for truthfulness." However, the Defendant has cited us to no authority for the proposition that an expert witness is "untruthful" when he or she omits from his or her CV a reprimand that is not related to the litigation at issue or that does not, in and of itself, impact the expert's qualifications and/or credibility. Cf. Miller v. SSM Health Care Corp., 193 S.W.3d 416, 419-21 (Mo. Ct. App. 2006) (trial court properly allowed defense counsel to cross-examine plaintiff's expert about censure he had received for making false representations as an expert). Given Dr. Stephens' explanation of the problems that led to her reprimand, none of which were targeted at her technical ability with performing autopsies, drawing conclusions therefrom, or making professional

misrepresentations, we fail to see how its omission from her CV established that she had been "untruthful."

In the context of expert witnesses, a CV is proffered in order to assist the trial court in determining whether the expert is qualified to testify. See, e.g., Caviglia v. Tate, 363 S.W.3d 298, 302-03 (Tex. Ct. App. 2012); Lamela v. City of New York, 560 F.Supp.2d 214, 224 (E.D.N.Y. 2008). A reprimand that does not go to these qualifications, or to a matter at issue in the litigation, is not required for this determination. Accordingly, we hold that the trial court did not abuse its discretion in prohibiting the defense from cross-examining Dr. Stephens about the reprimand and/or its exclusion from her CV. The Defendant is entitled to no relief on this issue.

*Prosecutorial Misconduct*

The Defendant contends that he is entitled to a new trial based on improper closing argument by the prosecutor. The Defendant avers that the prosecutor (1) asked the jury to draw impermissible inferences about the veracity of the defense expert witnesses, particularly by implying that their testimony was motivated by money; (2) misstated the medical evidence about whether the victim had osteoporosis; (3) urged the jury to speculate about the victim's cause and manner of death; (4) expressed his beliefs and opinions about the credibility of witnesses; and (5) appealed to the jury's "passions and prejudices." The State responds that, because the defense lodged no contemporaneous objections, this Court may not grant relief unless the alleged misconduct rises to the level of plain error.

Although trial courts possess substantial discretion in determining the propriety of closing arguments, they must restrict improper argument. State v. Hill, 333 S.W.3d 106, 130-31 (Tenn. Crim. App. 2010) (citing Sparks v. State, 563 S.W.2d 564, 569-70 (Tenn. Crim. App. 1978)). In making their closing arguments, both parties must be temperate and must predicate their arguments on evidence adduced at the trial. State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978). Additionally, summations "must be pertinent to the issues being tried." Id. (internal quotation marks omitted). Prosecutors, particularly, must proceed with caution due to their special role in the criminal justice system. See Hill, 333 S.W.3d at 131 (quoting Berger v. United States, 295 U.S. 78, 88 (1935)). "The State must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial. More specifically, the prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial." Id. (citing Dupree v. State, 410 S.W.2d 890, 891-92 (Tenn. 1967); Moore v. State, 17 S.W.2d 30, 35 (Tenn. 1929); Watkins v. State, 203 S.W. 344, 346 (Tenn. 1918); McCracken v. State, 489 S.W.2d 48, 50 (Tenn. Crim. App. 1972)).

Even if the record does demonstrate prosecutorial misconduct during closing arguments, this Court will not grant a new trial on that basis unless it is "so inflammatory or improper as to affect the verdict." Hill, 333 S.W.3d at 131. In determining whether the State's argument improperly prejudiced the defendant and affected the verdict to the defendant's detriment, this Court considers the following factors:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also State v. Scarborough, 300 S.W.3d 717, 731 (Tenn. Crim. App. 2009).

Initially, we note that the defense lodged a preliminary objection to the prosecution's closing argument. Prior to the beginning of the arguments, the defense advised the trial court that, "[p]ursuant to Rule 29.1 on closing arguments, I do want, you know, I want to hear the State's whole theory in their [initial closing argument] so they don't come back and argue a different theory at the end." The defense continued: "[A]ll of [the State's] case should come out in the first [closing argument] and we just ask that the Court follow Rule 29.1. That would be the only reason I would object to anything . . . ." The court responded, "The State should take notice of that. I think that's how we do [it]." During the ensuing arguments by the State, the defense lodged no objections.

As our supreme court recently has observed, "it is incumbent upon defense counsel to object contemporaneously whenever it deems the prosecution to be making improper argument. A contemporaneous objection provides the trial court with an opportunity to assess the State's argument and to caution the prosecution and issue a curative instruction to the jury if necessary." State v. Jordan, 325 S.W.3d 1, 57-58 (Tenn. 2010). The failure to lodge a contemporaneous objection results in a waiver of the issue on appeal. Id. at 58; see also State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996). We conclude that the Defendant has waived this argument.

When an issue is waived on appeal, this Court nevertheless may grant relief on a determination that plain error was committed. See Tenn. R. App. P. 36(b); State v. Adkisson, 899 S.W.2d 626, 636-38 (Tenn. Crim. App. 1994). We will grant relief for plain error only when five prerequisites are satisfied:

> (1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice.

Banks, 271 S.W.3d at 119-20; see also Adkisson, 899 S.W.2d at 641-42. The Defendant bears the burden of demonstrating plain error, and this Court need not consider all five factors "when it is clear from the record that at least one of them cannot be satisfied." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007).

Specifically, in this case, the Defendant argues in his brief that the State (1) attacked the Defendant's expert witnesses' credibility on the basis that they were paid; (2) misstated the evidence by averring that there was no medical proof of osteoporosis; (3) encouraged the jury to speculate by arguing, "[w]hat happened between those two leading up to this woman's death, we don't know, but there's enough smoke for you to consider that there was something there"; and (4) misstated Dr. Arden's testimony about the victim's bruises and about the likelihood of her drowning. We carefully have reviewed the State's closing arguments at trial with these points in mind. While we are troubled by these aspects of the State's closing arguments, nevertheless, viewed in context and in light of the record as a whole and our other holdings in this case, we conclude that consideration of these instances of improper argument is not necessary to do substantial justice. Accordingly, the Defendant is not entitled to plain error relief on this issue.

*Sufficiency of the Evidence*

The Defendant contends that the evidence is not sufficient to support his convictions of first degree premeditated murder and insurance fraud. Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v.

-74-

Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.[17] In any event, "[b]ecause a defendant has been afforded due process only when the evidence is sufficient as to each and every element of the crime, it is the responsibility of a reviewing court to carefully address whether the State has met its burden of proof." State v. White, 362 S.W.3d 559, 567 (Tenn. 2012).

<u>First Degree Premeditated Murder</u>

First degree premeditated murder is defined as the unlawful, intentional, and premeditated killing of another. Tenn. Code Ann. §§ 39-13-201 (2003), -202(a)(1) (2003). In the light most favorable to the prosecution, the proof in this case established that the victim died of asphyxiation. The manner of death was either undetermined or homicidal. Obviously, the jury determined that the Defendant killed the victim. We hold that, viewed in the light most favorable to the State, the proof is marginally sufficient to establish that the Defendant killed the victim. The Defendant admitted to being with the victim in the bathtub before she was found unresponsive by her daughter. The victim was found with her head above water, yet her lungs were filled with water. No drugs, other than a small amount of alcohol, were found in the victim's body. Dr. Stephens identified many bruises, both internal

---

[17] The Defendant contends that Dorantes should not apply to his case because it was decided while he was on trial. In Dorantes, the Tennessee Supreme Court specifically adopted the standard of review applied by the federal courts in reviewing the sufficiency of circumstantial evidence. Dorantes, 331 S.W.3d at 381. Prior to Dorantes, Tennessee's courts had applied the Crawford standard of review when reviewing the sufficiency of circumstantial evidence in criminal cases. See id. at 379-80 (citing State v. Crawford, 470 S.W.2d 610 (Tenn. 1971)). "The Crawford standard purportedly required the State to prove facts and circumstances 'so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt.'" Id. (quoting Crawford, 470 S.W.2d at 612). We need not decide this issue because, in our view, either standard of review would result in the same result under the facts and circumstances of this case.

and external, on the victim's body, as well as a fracture to the victim's left upper arm and petechial hemorrhages. Dr. Stephens attributed these injuries to blunt trauma inflicted at or near the time of death. The Defendant's testimony that he and the victim had intimate relations in the bath shortly before her death permits the inference that these injuries were inflicted after that encounter. Although far from overwhelming, under our standard of review, this proof is sufficient to establish that the Defendant caused the victim's injuries and caused her to asphyxiate by drowning.

However, to convict a defendant of first degree premeditated murder, the State must establish sufficient facts to prove premeditation beyond a reasonable doubt.

Premeditation is defined statutorily as follows:

"[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d). Of course, an accused's mental state at the time of the decision to kill is often difficult to discern. Thus, Tennessee courts frequently look to the circumstances surrounding the killing in order to determine if the proof is sufficient to support a jury's finding of premeditation. See State v. Jackson, 173 S.W.3d 401, 408 (Tenn. 2005); see also, e.g., State v. Young, 196 S.W.3d 85, 108 (Tenn. 2006); State v. Vaughn, 279 S.W.3d 584, 594-95 (Tenn. Crim. App. 2008). Circumstances that may indicate premeditation include the use of a deadly weapon upon an unarmed victim; lack of provocation by the victim; the accused's declarations of an intent to kill; the accused's failure to render aid to the victim; facts indicative that the accused had a motive to kill the victim; the particular cruelty of the killing; the accused's procurement of a weapon prior to the killing; preparations to conceal the crime before the crime is committed; destruction or secretion of evidence of the killing; and the accused's calmness immediately after the killing. See State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). Combined with other of these circumstances, proof of repeated blows to the victim is also relevant to establish premeditation. See State v. Millsaps, 30 S.W.3d 364, 369 (Tenn. Crim. App. 2000) (citing State v. Brown, 836 S.W.2d 530, 542 (Tenn. 1992)). Nevertheless, "a jury may not engage in speculation." Jackson, 173 S.W.3d at 408; see also State v. West, 844 S.W.2d 144, 148 (Tenn. 1992) ("Although the jury

is permitted to disbelieve the defendant's testimony, it may not construct a theory based on no evidence at all.").

Considering these factors in light of the proof in this case and the record as a whole, we are constrained to conclude that the State failed to adduce sufficient proof to establish that the Defendant killed the victim with premeditation.

Reviewing the above list of factors supportive of an inference of premeditation, clearly there is no proof in the record indicating that the Defendant procured or used a deadly weapon on the victim; no proof that the Defendant ever declared an intent to kill the victim; no proof of preparations to conceal the crime prior to committing it; and no proof that the Defendant destroyed or secreted evidence of the killing. Contrary to failing to provide aid, the proof established that the Defendant rendered aid to the victim and that he was distraught while in the presence of Dr. Wiles as they performed CPR on the victim. There was no proof of hostility between the Defendant and the victim. See Jackson, 173 S.W.3d at 401. The record is also devoid of proof indicating that the Defendant was "sufficiently free from excitement and passion" at the time the Defendant allegedly decided to kill the victim. Tenn. Code Ann. § 39-13-202(d); see State v. Brandon Compton, No. E2005-01419-CCA-R3CD, 2006 WL 2924992, at *5 (Tenn. Crim. App. Oct. 13, 2006), perm. app. denied (Tenn. Feb. 26, 2007).

The State argues that the proof established that the Defendant had a motive for killing the victim: the recovery of insurance proceeds on the victim's life. The State claims that the Defendant's motive is established because "[h]e was unemployed, and they were having financial problems because of his unemployment." We disagree that, even taken in the light most favorable to the State, the proof established a motive that the Defendant killed the victim for the life insurance proceeds. First, the only proof of the couple's alleged financial troubles came solely from the victim's daughter, who was eleven years old at the time. She testified only that the couple argued about money. This proof is simply too tenuous upon which to base a finding of motive to kill.

Second, although the Defendant was unemployed at the time of the victim's death, the proof in the record established that he had been receiving disability income as well as income from several rental properties. The proof also established that the rental properties were occupied by tenants and that the mortgages on these properties were current. Additionally, the victim was employed and earning a significant income. The State offered no evidence and there is no proof in the record that the couple's combined income was not sufficient to sustain their lifestyle or that they were otherwise in financial difficulties. While the Defendant testified that the victim feared losing her job, this circumstance does not establish the Defendant's motive to kill the victim for the life insurance proceeds.

Third, the life insurance proceeds collected by the Defendant arose primarily from two different sources: life insurance on the victim's life provided by her employer, which the Defendant had nothing to do with procuring; and life insurance obtained in conjunction with refinancing the couple's real estate investments.[18] This latter insurance was obtained over a year before the victim's death. The primary insured was the Defendant. The proof established that it was obtained at the victim's request because of the Defendant's prior health problems. The life insurance on the victim was added as a rider because it was inexpensive. There is no proof in the record that the Defendant obtained life insurance on the victim's life with an eye toward killing her and collecting the proceeds. Indeed, the proof demonstrates little difference in this case from any other case in which a beneficiary recovers life insurance proceeds following the decedent's death under unexplained circumstances. Thus, we hold that the proof in this case is not sufficient to establish a motive that the Defendant killed the victim in order to collect the proceeds from her life insurance.

The State also argues that the proof established that the Defendant was calm after killing the victim, asserting that, after he drowned the victim, "he staged her body in the bathtub, dressed himself, and went outside to wait for the victim's daughter to arrive home and find the body." We are not persuaded. First, even if the Defendant "staged" the victim's body, there is no proof in the record as to the state of the Defendant's mind as he was doing so. This argument is analogous to an accused's destruction or concealment of evidence of the killing. This Court has recognized, however, that

> "[t]he concealment of evidence may be associated with the commission of any crime and the accompanying fear of punishment. One who kills another in a passionate rage may dispose of the weapon when reason returns just as readily as the cool, dispassionate killer. The fact that evidence is subsequently hidden from the police reveals nothing about a criminal's state of mind before the crime."

State v. Long, 45 S.W.3d 611, 621 (Tenn. Crim. App. 2000) (quoting West, 844 S.W.2d at 148).

Second, the uncontradicted proof established that a significant period of time had elapsed after the Defendant left the victim in the bathtub before the victim's daughter arrived home. This passage of time could have accounted for the Defendant's apparent calm when Tia initially saw him. We note that our supreme court has emphasized that an inference of

---

[18] There was also life insurance on the victim through the Defendant's employer, which he explained was provided automatically. According to Lt. Sherfey's testimony, the amount of money paid on this policy was $26,000.

premeditation may be drawn from an accused's calmness *immediately after* the killing. See Bland, 958 S.W.2d at 660 ("Calmness immediately following a killing is evidence of a cool, dispassionate, premeditated murder.") (citing West, 844 S.W.2d at 148). Thus, this Court has rejected a jury's finding of premeditation when there is "no evidence in the record regarding [the d]efendant's behavior *immediately* following the crime," explaining that "[e]vidence of [the d]efendant's conduct at more remote points of time after the homicide is not directly probative of [the d]efendant's mind set at the time of the killing." Long, 45 S.W.3d at 622 (citing West, 844 S.W.2d at 148) (emphasis in Long). This accords with common sense because calmness is an appropriate response to the successful completion of a plan. When one kills while in the throes of anger or other passionate emotion, however, calmness is far less likely to be the immediate response. In short, we hold that the proof is not sufficient to establish that the Defendant was calm immediately after the killing.

Finally, the State argues that the victim "was severely beaten, which shows the particular cruelty of the killing." The State's theory at trial was that the victim's injuries and death were inflicted by the Defendant grabbing her arms from behind, twisting and fracturing them, forcing the victim over the edge of the bathtub, thereby fracturing her sternum, and holding her head under water, causing her to drown. While we certainly agree that such a killing is violent and horrifying to the victim, the proof in this case does not support the conclusion that the victim was "severely beaten" in the sense that the Defendant struck her repeatedly. Cf., e.g., Brown, 836 S.W.2d at 543-44. Moreover, even if the victim's death was inflicted in a "particularly cruel" manner, this circumstance alone is not sufficient to support a finding of premeditation.

In sum, we hold that the State failed to adduce sufficient proof to establish that the Defendant killed the victim with premeditation. See, e.g., State v. Ricky A. Burks, No. M2000-00345-CCA-R3-CD, 2001 WL 567915, at *17-18 (Tenn. Crim. App. May 25, 2001) (holding proof insufficient to establish premeditation, explaining that "[t]he absence of planning activity and the absence of the events immediately preceding the killing militate against proof of premeditation or that the [defendant] killed according to a preconceived design"); State v. Patrick Wingate, No. M1999-00624-CCA-R3-CD, 2000 WL 680388, at *6-7 (Tenn. Crim. App. May 25, 2000) (holding proof insufficient to support first degree premeditated murder conviction although State adduced proof of financial motive, the defendant's display of no emotion upon leaving the scene, and the infliction of multiple blows). Accordingly, we reverse the Defendant's conviction of first degree premeditated murder and dismiss that charge. Because we have found the proof marginally sufficient to support a conviction of second degree murder, defined as a knowing killing of another,[19] the Defendant may be retried for second degree murder and any appropriate lesser-included

---

[19] See Tenn. Code Ann. § 39-13-210(a)(1) (2003).

offenses. See State v. Maupin, 859 S.W.2d 313, 318 (Tenn. 1993). Principles of double jeopardy prohibit the Defendant from being retried for first degree premeditated murder. See id. at 317-18; Long, 45 S.W.3d at 622.

## Insurance Fraud

As charged in this case, insurance fraud is committed when the accused intentionally presents a false or fraudulent claim for the payment of loss upon a contract of insurance. See Tenn. Code Ann. § 39-14-133 (2003). The Defendant was convicted of one count of this crime based on his claim for proceeds under the life insurance policy issued by Fidelity & Guaranty, which the Defendant and the victim purchased in conjunction with refinancing their real estate investments.

The Defendant argues that the State failed to adduce sufficient proof to support this conviction because it introduced no claim document. However, we have carefully reviewed Exhibit TT, which includes a copy of the insurance policy issued to the Defendant and the victim; a copy of their application for the policy; and, contrary to the Defendant's assertion, a copy of a "Statement of Claim" dated July 20, 2004 and bearing the Defendant's name. Thus, the jury had before it proof that the Defendant made a claim for the payment of loss upon a contract of insurance.

Nevertheless, the claim provides that the victim's cause of death was "asphyxiation also with blunt trauma." Accordingly, we fail to see how the claim was "false or fraudulent." The State argues in its brief that, "[p]ursuant to the terms of the insurance policy, . . . the [D]efendant would only be reimbursed for an accidental death." Thus, the State argues, the Defendant's claim was false or fraudulent because he knew that the victim's death was not accidental. However, we have carefully reviewed Exhibit TT and, other than an exclusion for death by suicide within two years of the issue date, it does not appear that death benefits were limited to accidental deaths.

We recognize that, as a matter of public policy, murderers are prohibited from recovering on the life insurance policies of their victims. See Tenn. Code Ann. § 31-1-106 (2007); Bolin v. Bolin, 99 S.W.3d 102, 105-07 (Tenn. Ct. App. 2002). However, the Defendant was convicted of submitting a false or fraudulent claim for the payment of life insurance proceeds on the victim's life. Our review of the claim form reveals no false or fraudulent statement by the Defendant. Accordingly, we hold that the State failed to adduce sufficient proof to support the Defendant's conviction of insurance fraud as charged in this case. Therefore, we must reverse the Defendant's conviction of insurance fraud and dismiss the charge.

## Conclusion

We have determined that the trial court failed to exercise its mandatory duty to act as thirteenth juror in this case; that the trial court committed reversible error in failing to exclude Dr. Mileusnic as a witness for the State; that the State failed to adduce sufficient proof to establish that the Defendant killed the victim with premeditation; and that the State failed to adduce sufficient proof that the Defendant committed insurance fraud as charged in this case. Accordingly, we must reverse the Defendant's conviction of first degree premeditated murder and remand this matter for a new trial on the charge of second degree murder. We also must reverse the Defendant's conviction of insurance fraud and dismiss that charge.

For the foregoing reasons, we reverse the judgments of the trial court and remand this matter for further proceedings consistent with this opinion.

_____
JEFFREY S. BIVINS, JUDGE